## PAYTON v. NEW YORK

No. 78–5420.   Argued March 26, 1979—Reargued October 9, 1979—
Decided April 15, 1980*

---

*Together with No. 78–5421, *Riddick* v. *New York,* also on appeal from the same court.

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, STEWART, MARSHALL, BLACKMUN, and POWELL, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post,* p. 603. WHITE, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post,* p. 603. REHNQUIST, J., filed a dissenting opinion, *post,* p. 620.

*William E. Hellerstein* reargued the cause for appellants in both cases. With him on the briefs was *David A. Lewis.*

*Peter L. Zimroth* reargued the cause for appellee in both cases. With him on the briefs were *John J. Santucci, Henry J. Steinglass, Brian Rosner,* and *Vivian Berger.*

MR. JUSTICE STEVENS delivered the opinion of the Court.

These appeals challenge the constitutionality of New York statutes that authorize police officers to enter a private residence without a warrant and with force, if necessary, to make a routine felony arrest.

The important constitutional question presented by this challenge has been expressly left open in a number of our prior opinions. In *United States* v. *Watson,* 423 U. S. 411, we upheld a warrantless "midday public arrest," expressly noting that the case did not pose "the still unsettled ques-

tion . . . 'whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest.' " *Id.*, at 418, n. 6.[1] The question has been answered in different ways by other appellate courts. The Supreme Court of Florida rejected the constitutional attack,[2] as did the New York Court of Appeals in this case. The courts of last resort in 10 other States, however, have held that unless special circumstances are present, warrantless arrests in the home are unconstitutional.[3] Of the seven United States Courts of Appeals that have considered the question, five have expressed the opinion that such arrests are unconstitutional.[4]

---

[1] See also *United States* v. *Watson,* 423 U. S., at 433 (STEWART, J., concurring); *id.,* at 432–433 (POWELL, J., concurring); *Gerstein* v. *Pugh,* 420 U. S. 103, 113, n. 13; *Coolidge* v. *New Hampshire,* 403 U. S. 443, 474–481; *Jones* v. *United States,* 357 U. S. 493, 499–500. Cf. *United States* v. *Santana,* 427 U. S. 38.

[2] See *State* v. *Perez,* 277 So. 2d 778 (1973), cert. denied, 414 U. S. 1064.

[3] See *State* v. *Cook,* 115 Ariz. 188, 564 P. 2d 877 (1977) (resting on both state and federal constitutional provisions); *People* v. *Ramey,* 16 Cal. 3d 263, 545 P. 2d 1333 (1976), cert. denied, 429 U. S. 929 (state and federal); *People* v. *Moreno,* 176 Colo. 488, 491 P. 2d 575 (1971) (federal only); *State* v. *Jones,* 274 N. W. 2d 273 (Iowa 1979) (state and federal); *State* v. *Platten,* 225 Kan. 764, 594 P. 2d 201 (1979) (state and federal); *Commonwealth* v. *Forde,* 367 Mass. 798, 329 N. E. 2d 717 (1975) (federal only); *State* v. *Olson,* 287 Ore. 157, 598 P. 2d 670 (1979) (state and federal); *Commonwealth* v. *Williams,* 483 Pa. 293, 396 A. 2d 1177 (1978) (federal only); *State* v. *McNeal,* 251 S. E. 2d 484 (W. Va. 1978) (state and federal); *Laasch* v. *State,* 84 Wis. 2d 587, 267 N. W. 2d 278 (1978) (state and federal).

[4] Compare *United States* v. *Reed,* 572 F. 2d 412 (CA2 1978), cert. denied *sub nom. Goldsmith* v. *United States,* 439 U. S. 913; *United States* v. *Killebrew,* 560 F. 2d 729 (CA6 1977); *United States* v. *Shye,* 492 F. 2d 886 (CA6 1974); *United States* v. *Houle,* 603 F. 2d 1297 (CA8 1979); *United States* v. *Prescott,* 581 F. 2d 1343 (CA9 1978); *Dorman* v. *United States,* 140 U. S. App. D. C. 313, 435 F. 2d 385 (1970), with *United States* v. *Williams,* 573 F. 2d 348 (CA5 1978); *United States ex rel. Wright* v. *Woods,* 432 F. 2d 1143 (CA7 1970), cert. denied, 401 U. S. 966. Three other Circuits have assumed without deciding that warrant-

Last Term we noted probable jurisdiction of these appeals in order to address that question. 439 U. S. 1044. After hearing oral argument, we set the case for reargument this Term. 441 U. S. 930. We now reverse the New York Court of Appeals and hold that the Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, *Mapp* v. *Ohio,* 367 U. S. 643; *Wolf* v. *Colorado,* 338 U. S. 25, prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest.

We first state the facts of both cases in some detail and put to one side certain related questions that are not presented by these records. We then explain why the New York statutes are not consistent with the Fourth Amendment and why the reasons for upholding warrantless arrests in a public place do not apply to warrantless invasions of the privacy of the home.

I

On January 14, 1970, after two days of intensive investigation, New York detectives had assembled evidence sufficient to establish probable cause to believe that Theodore Payton had murdered the manager of a gas station two days earlier. At about 7:30 a. m. on January 15, six officers went to Payton's apartment in the Bronx, intending to arrest him. They had not obtained a warrant. Although light and music emanated from the apartment, there was no response to their knock on the metal door. They summoned emergency assistance and, about 30 minutes later, used crowbars to break open the door and enter the apartment. No one was there. In plain view, however, was a .30-caliber shell casing that was

less home arrests are unconstitutional. *United States* v. *Bradley,* 455 F. 2d 1181 (CA1 1972); *United States* v. *Davis,* 461 F. 2d 1026 (CA3 1972); *Vance* v. *North Carolina,* 432 F. 2d 984 (CA4 1970). And one Circuit has upheld such an arrest without discussing the constitutional issue. *Michael* v. *United States,* 393 F. 2d 22 (CA10 1968).

seized and later admitted into evidence at Payton's murder trial.[5]

In due course Payton surrendered to the police, was indicted for murder, and moved to suppress the evidence taken from his apartment. The trial judge held that the warrantless and forcible entry was authorized by the New York Code of Criminal Procedure,[6] and that the evidence in plain view was properly seized. He found that exigent circumstances justified the officers' failure to announce their purpose before entering the apartment as required by the statute.[7] He had no

---

[5] A thorough search of the apartment resulted in the seizure of additional evidence tending to prove Payton's guilt, but the prosecutor stipulated that the officers' warrantless search of the apartment was illegal and that all the seized evidence except the shell casing should be suppressed.

"MR. JACOBS: There's no question that the evidence that was found in bureau drawers and in the closet was illegally obtained. I'm perfectly willing to concede that, and I do so in my memorandum of law. There's no question about that." App. 4.

[6] "At the time in question, January 15, 1970, the law applicable to the police conduct related above was governed by the Code of Criminal Procedure. Section 177 of the Code of Criminal Procedure as applicable to this case recited: 'A peace officer may, without a warrant, arrest a person . . . 3. When a felony has in fact been committed, and he has reasonable cause for believing the person to be arrested to have committed it.' Section 178 of the Code of Criminal Procedure provided: 'To make an arrest, as provided in the last section [177], the officer may break open an outer or inner door or window of a building, if, after notice of his office and purpose, he be refused admittance.'" 84 Misc. 2d 973, 974–975, 376 N. Y. S. 2d 779, 780 (Sup. Ct., Trial Term, N. Y. County, 1974).

[7] "Although Detective Malfer knocked on the defendant's door, it is not established that at this time he announced that his purpose was to arrest the defendant. Such a declaration of purpose is unnecessary when exigent circumstances are present (*People* v. *Wojciechowski,* 31 AD 2d 658; *People* v. *McIlwain,* 28 AD 2d 711).

"'Case law has made exceptions from the statute or common-law rules for exigent circumstances which may allow dispensation with the notice . . . It has also been held or suggested that notice is not required if there is reason to believe that it will allow an escape or increase unreasonably the

occasion, however, to decide whether those circumstances also would have justified the failure to obtain a warrant, because he concluded that the warrantless entry was adequately supported by the statute without regard to the circumstances. The Appellate Division, First Department, summarily affirmed.[8]

On March 14, 1974, Obie Riddick was arrested for the commission of two armed robberies that had occurred in 1971. He had been identified by the victims in June 1973, and in January 1974 the police had learned his address. They did not obtain a warrant for his arrest. At about noon on March 14, a detective, accompanied by three other officers, knocked on the door of the Queens house where Riddick was living. When his young son opened the door, they could see Riddick sitting in bed covered by a sheet. They entered the house and placed him under arrest. Before permitting him to dress, they opened a chest of drawers two feet from the bed in search of weapons and found narcotics and related paraphernalia. Riddick was subsequently indicted on narcotics charges. At a suppression hearing, the trial judge held that the warrantless entry into his home was authorized by the revised New York statute,[9] and that the search of the imme-

---

physical risk to the police or to innocent persons.' (*People* v. *Floyd,* 26 NY 2d 558, 562.)

"The facts of this matter indicate that a grave offense had been committed; that the suspect was reasonably believed to be armed and could be a danger to the community; that a clear showing of probable cause existed and that there was strong reason to believe that the suspect was in the premises being entered and that he would escape if not swiftly apprehended. From this fact the court finds that exigent circumstances existed to justify noncompliance with section 178. The court holds, therefore, that the entry into defendant's apartment was valid." *Id.,* at 975, 376 N. Y. S. 2d, at 780–781.

[8] 55 App. Div. 2d 859 (1976).

[9] New York Crim. Proc. Law § 140.15 (4) (McKinney 1971) provides, with respect to arrest without a warrant:

"In order to effect such an arrest, a police officer may enter premises in which he reasonably believes such person to be present, under the same

diate area was reasonable under *Chimel* v. *California*, 395 U. S. 752.[10] The Appellate Division, Second Department, affirmed the denial of the suppression motion.[11]

The New York Court of Appeals, in a single opinion, affirmed the convictions of both Payton and Riddick. 45 N. Y. 2d 300, 380 N. E. 2d 224 (1978). The court recognized that the question whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest had not been settled either by that court or by this Court.[12] In answering that question, the majority of four judges relied primarily on its perception that there is a

> ". . . substantial difference between the intrusion which attends an entry for the purpose of searching the premises and that which results from an entry for the purpose of

circumstances and in the same manner as would be authorized, by the provisions of subdivisions four and five of section 120.80, if he were attempting to make such arrest pursuant to a warrant of arrest."

Section 120.80, governing execution of arrest warrants, provides in relevant part:

"4. In order to effect the arrest, the police officer may, under circumstances and in a manner prescribed in this subdivision, enter any premises in which he reasonably believes the defendant to be present. Before such entry, he must give, or make reasonable effort to give, notice of his authority and purpose to an occupant thereof, unless there is reasonable cause to believe that the giving of such notice will:

"(a) Result in the defendant escaping or attempting to escape; or

"(b) Endanger the life or safety of the officer or another person; or

"(c) Result in the destruction, damaging or secretion of material evidence.

"5. If the officer is authorized to enter premises without giving notice of his authority and purpose, or if after giving such notice he is not admitted, he may enter such premises, and by a breaking if necessary."

[10] App. 63–66.

[11] 56 App. Div. 2d 937, 392 N. Y. S. 2d 848 (1977). One justice dissented on the ground that the officers' failure to announce their authority and purpose before entering the house made the arrest illegal as a matter of state law.

[12] 45 N. Y. 2d, at 309–310, 380 N. E. 2d, at 228.

making an arrest, and [a] significant difference in the governmental interest in achieving the objective of the intrusion in the two instances." *Id.*, at 310, 380 N. E. 2d, at 228–229.[13]

---

[13] The majority continued:

"In the case of the search, unless appropriately limited by the terms of a warrant, the incursion on the householder's domain normally will be both more extensive and more intensive and the resulting invasion of his privacy of greater magnitude than what might be expected to occur on an entry made for the purpose of effecting his arrest. A search by its nature contemplates a possibly thorough rummaging through possessions, with concurrent upheaval of the owner's chosen or random placement of goods and articles and disclosure to the searchers of a myriad of personal items and details which he would expect to be free from scrutiny by uninvited eyes. The householder by the entry and search of his residence is stripped bare, in greater or lesser degree, of the privacy which normally surrounds him in his daily living, and, if he should be absent, to an extent of which he will be unaware.

"Entry for the purpose of arrest may be expected to be quite different. While the taking into custody of the person of the householder is unquestionably of grave import, there is no accompanying prying into the area of expected privacy attending his possessions and affairs. That personal seizure alone does not require a warrant was established by *United States* v. *Watson* (423 US 411, *supra*), which upheld a warrantless arrest made in a public place. In view of the minimal intrusion on the elements of privacy of the home which results from entry on the premises for making an arrest (as compared with the gross intrusion which attends the arrest itself), we perceive no sufficient reason for distinguishing between an arrest in a public place and an arrest in a residence. To the extent that an arrest will always be distasteful or offensive, there is little reason to assume that arrest within the home is any more so than arrest in a public place; on the contrary, it may well be that because of the added exposure the latter may be more objectionable.

"At least as important, and perhaps even more so, in concluding that entries to make arrests are not 'unreasonable'—the substantive test under the constitutional proscriptions—is the objective for which they are made, viz., the arrest of one reasonably believed to have committed a felony, with resultant protection to the community. The 'reasonableness' of any governmental intrusion is to be judged from two perspectives—that of the defendant, considering the degree and scope of the invasion of his

The majority supported its holding by noting the "apparent historical acceptance" of warrantless entries to make felony arrests, both in the English common law and in the practice of many American States.[14]

Three members of the New York Court of Appeals dissented on this issue because they believed that the Constitution requires the police to obtain a "warrant to enter a home in order to arrest or seize a person, unless there are exigent circumstances." [15] Starting from the premise that, except in carefully circumscribed instances, "the Fourth Amendment forbids police entry into a private home to search for and seize an object without a warrant," [16] the dissenters reasoned that an arrest of the person involves an even greater invasion of privacy and should therefore be attended with at least as

---

person or property; that of the People, weighing the objective and imperative of governmental action. The community's interest in the apprehension of criminal suspects is of a higher order than is its concern for the recovery of contraband or evidence; normally the hazards created by the failure to apprehend far exceed the risks which may follow nonrecovery." *Id.,* at 310–311, 380 N. E. 2d, at 229.

[14] "The apparent historical acceptance in the English common law of warrantless entries to make felony arrests (2 Hale, Historia Placitorum Coronae, History of Pleas of Crown [1st Amer ed, 1847], p. 92; Chitty, Criminal Law [3d Amer, from 2d London, ed, 1836] 22–23), and the existence of statutory authority for such entries in this State since the enactment of the Code of Criminal Procedure in 1881 argue against a holding of unconstitutionality and substantiate the reasonableness of such procedure. . . .

"Nor do we ignore the fact that a number of jurisdictions other than our own have also enacted statutes authorizing warrantless entries of buildings (without exception for homes) for purposes of arrest. The American Law Institute's Model Code of Pre-Arraignment Procedure makes similar provision in section 120.6, with suggested special restrictions only as to nighttime entries." *Id.,* at 311–312, 380 N. E. 2d, at 229–230 (footnote omitted).

[15] *Id.,* at 315, 380 N. E. 2d, at 232 (Wachtler, J., dissenting).

[16] *Id.,* at 319–320, 380 N. E. 2d, at 235 (Cooke, J., dissenting).

great a measure of constitutional protection.[17]   The dissenters noted "the existence of statutes and the American Law Institute imprimatur codifying the common-law rule authorizing warrantless arrests in private homes" and acknowledged that "the statutory authority of a police officer to make a warrantless arrest in this State has been in effect for almost 100 years," but concluded that "neither antiquity nor legislative unanimity can be determinative of the grave constitutional question presented" and "can never be a substitute for reasoned analysis." [18]

Before addressing the narrow question presented by these appeals,[19] we put to one side other related problems that are

[17] "Although the point has not been squarely adjudicated since *Coolidge* [v. *New Hampshire*, 403 U. S. 443,] (see *United States* v. *Watson*, 423 US 411, 418, n. 6), its proper resolution, it is submitted, is manifest.   At the core of the Fourth Amendment, whether in the context of a search or an arrest, is the fundamental concept that any governmental intrusion into an individual's home or expectation of privacy must be strictly circumscribed (see, *e. g.*, *Boyd* v. *United States*, 116 US 616, 630; *Camara* v. *Municipal Ct.*, 387 US 523, 528).   To achieve that end, the framers of the amendment interposed the warrant requirement between the public and the police, reflecting their conviction that the decision to enter a dwelling should not rest with the officer in the field, but rather with a detached and disinterested Magistrate (*McDonald* v. *United States*, 335 US 451, 455–456; *Johnson* v. *United States*, 333 US 10, 13–14). Inasmuch as the purpose of the Fourth Amendment is to guard against arbitrary governmental invasions of the home, the necessity of prior judicial approval should control any contemplated entry, regardless of the purpose for which that entry is sought.   By definition, arrest entries must be included within the scope of the amendment, for while such entries are for persons, not things, they are, nonetheless, violations of privacy, the chief evil that the Fourth Amendment was designed to deter (*Silverman* v. *United States*, 365 US 505, 511)."   *Id.*, at 320–321, 380 N. E. 2d, at 235–236 (Cooke, J., dissenting).

[18] *Id.*, at 324, 380 N. E. 2d, at 238 (Cooke, J., dissenting).

[19] Although it is not clear from the record that appellants raised this constitutional issue in the trial courts, since the highest court of the State passed on it, there is no doubt that it is properly presented for review by this Court.   See *Raley* v. *Ohio*, 360 U. S. 423, 436.

*not* presented today. Although it is arguable that the warrantless entry to effect Payton's arrest might have been justified by exigent circumstances, none of the New York courts relied on any such justification. The Court of Appeals majority treated both Payton's and Riddick's cases as involving routine arrests in which there was ample time to obtain a warrant,[20] and we will do the same. Accordingly, we have no occasion to consider the sort of emergency or dangerous situation, described in our cases as "exigent circumstances," that would justify a warrantless entry into a home for the purpose of either arrest or search.

Nor do these cases raise any question concerning the authority of the police, without either a search or arrest warrant, to enter a third party's home to arrest a suspect. The police broke into Payton's apartment intending to arrest Payton, and they arrested Riddick in his own dwelling. We also note that in neither case is it argued that the police lacked probable cause to believe that the suspect was at home when they entered. Finally, in both cases we are dealing with entries into homes made without the consent of any occupant. In *Payton,* the police used crowbars to break down the door and in *Riddick,* although his 3-year-old son answered the door, the police entered before Riddick had an opportunity either to object or to consent.

## II

It is familiar history that indiscriminate searches and seizures conducted under the authority of "general warrants" were the immediate evils that motivated the framing and adoption of the Fourth Amendment.[21] Indeed, as originally

---

[20] 45 N. Y. 2d, at 308, 380 N. E. 2d, at 228. Judge Wachtler in dissent, however, would have upheld the warrantless entry in Payton's case on exigency grounds, and therefore agreed with the majority's refusal to suppress the shell casing. See *id.,* at 315, 380 N. E. 2d, at 232.

[21] "Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the

proposed in the House of Representatives, the draft contained only one clause, which directly imposed limitations on the issuance of warrants, but imposed no express restrictions on warrantless searches or seizures.[22] As it was ultimately adopted, however, the Amendment contained two separate clauses, the first protecting the basic right to be free from unreasonable searches and seizures and the second requiring that warrants be particular and supported by probable cause.[23] The Amendment provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

---

Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of British tax laws. They were denounced by James Otis as 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book,' because they placed 'the liberty of every man in the hands of every petty officer.' The historic occasion of that denunciation, in 1761 at Boston, has been characterized as 'perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. "Then and there," said John Adams, "then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born." ' *Boyd* v. *United States*, 116 U. S. 616, 625." *Stanford* v. *Texas*, 379 U. S. 476, 481–482.

See also J. Landynski, Search and Seizure and the Supreme Court 19–48 (1966); N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 13–78 (1937); T. Taylor, Two Studies in Constitutional Interpretation 19–44 (1969).

[22] " 'The rights of the people to be secured in their persons, their houses, their papers, and their other property, from all unreasonable searches and seizures, shall not be violated by warrants issued without probable cause, supported by oath or affirmation, or not particularly describing the places to be searched, or the persons or things to be seized.' Annals of Cong., 1st Cong., 1st sess., p. 452." Lasson, *supra*, at 100, n. 77.

[23] "The general right of security from unreasonable search and seizure was given a sanction of its own and the amendment thus intentionally given a broader scope. That the prohibition against 'unreasonable searches' was intended, accordingly, to cover something other than the form of the

and seizures, shall not be violated, and no Warrants
shall issue, but upon probable cause, supported by Oath
or affirmation, and particularly describing the place to be
searched, and the persons or things to be seized."

It is thus perfectly clear that the evil the Amendment was
designed to prevent was broader than the abuse of a general
warrant. Unreasonable searches or seizures conducted with-
out any warrant at all are condemned by the plain language
of the first clause of the Amendment. Almost a century ago
the Court stated in resounding terms that the principles
reflected in the Amendment "reached farther than the con-
crete form" of the specific cases that gave it birth, and "apply
to all invasions on the part of the government and its em-
ployés of the sanctity of a man's home and the privacies of
life." *Boyd* v. *United States,* 116 U. S. 616, 630. Without
pausing to consider whether that broad language may require
some qualification, it is sufficient to note that the warrantless
arrest of a person is a species of seizure required by the
Amendment to be reasonable. *Beck* v. *Ohio,* 379 U. S. 89.
Cf. *Delaware* v. *Prouse,* 440 U. S. 648. Indeed, as MR. JUS-
TICE POWELL noted in his concurrence in *United States* v.
*Watson,* the arrest of a person is "quintessentially a seizure."
423 U. S., at 428.

The simple language of the Amendment applies equally to
seizures of persons and to seizures of property. Our analysis
in this case may therefore properly commence with rules that
have been well established in Fourth Amendment litigation
involving tangible items. As the Court reiterated just a few
years ago, the "physical entry of the home is the chief evil
against which the wording of the Fourth Amendment is
directed." *United States* v. *United States District Court,*

---

warrant is a question no longer left to implication to be derived from the
phraseology of the Amendment." Lasson, *supra,* at 103. (Footnote
omitted.)

407 U. S. 297, 313. And we have long adhered to the view that the warrant procedure minimizes the danger of needless intrusions of that sort.[24]

It is a "basic principle of Fourth Amendment law" that searches and seizures inside a home without a warrant are presumptively unreasonable.[25] Yet it is also well settled that

[24] As Mr. Justice Jackson so cogently observed in *Johnson* v. *United States,* 333 U. S. 10, 13–14:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." (Footnotes omitted.)

[25] As the Court stated in *Coolidge* v. *New Hampshire:*

"Both sides to the controversy appear to recognize a distinction between searches and seizures that take place on a man's property—his home or office—and those carried out elsewhere. It is accepted, at least as a matter of principle, that a search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'

.        .        .        .        .

"It is clear, then, that the notion that the warrantless entry of a man's house in order to arrest him on probable cause is *per se* legitimate is in fundamental conflict with the basic principle of Fourth Amendment law that searches and seizures inside a man's house without warrant are *per se*

objects such as weapons or contraband found in a public place may be seized by the police without a warrant. The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity. The distinction between a warrantless seizure in an open area and such a seizure on private premises was plainly stated in *G. M. Leasing Corp.* v. *United States,* 429 U. S. 338, 354:

> "It is one thing to seize without a warrant property resting in an open area or seizable by levy without an intrusion into privacy, and it is quite another thing to effect a warrantless seizure of property, even that owned by a corporation, situated on private premises to which access is not otherwise available for the seizing officer."

As the late Judge Leventhal recognized, this distinction has equal force when the seizure of a person is involved. Writing on the constitutional issue now before us for the United States Court of Appeals for the District of Columbia Circuit sitting en banc, *Dorman* v. *United States,* 140 U. S. App. D. C. 313, 435 F. 2d 385 (1970), Judge Leventhal first noted the settled rule that warrantless arrests in public places are valid. He immediately recognized, however, that

> "[a] greater burden is placed . . . on officials who enter a home or dwelling without consent. Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment."
> *Id.,* at 317, 435 F. 2d, at 389. (Footnote omitted.)

His analysis of this question then focused on the long-settled premise that, absent exigent circumstances, a warrant-

---

unreasonable in the absence of some one of a number of well defined 'exigent circumstances.'" 403 U. S., at 474–475, 477–478.

Although Mr. Justice Harlan joined this portion of the Court's opinion, he expressly disclaimed any position on the issue now before us. *Id.,* at 492 (concurring opinion).

less entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within.[26] He reasoned that the constitutional protection afforded to the individual's interest in the privacy of his own home is equally applicable to a warrantless entry for the purpose of arresting a resident of the house; for it is inherent in such an entry that a search for the suspect may be required before he can be apprehended.[27] Judge Leventhal concluded that an entry to arrest and an entry to search for and to seize property implicate the same interest in preserving the privacy and the sanctity of the home, and justify the same level of constitutional protection.

This reasoning has been followed in other Circuits.[28] Thus, the Second Circuit recently summarized its position:

"To be arrested in the home involves not only the inva-

---

[26] As Mr. Justice Harlan wrote for the Court:

"It is settled doctrine that probable cause for belief that certain articles subject to seizure are in a dwelling cannot of itself justify a search without a warrant. *Agnello* v. *United States*, 269 U. S. 20, 33; *Taylor* v. *United States*, 286 U. S. 1, 6. The decisions of this Court have time and again underscored the essential purpose of the Fourth Amendment to shield the citizen from unwarranted intrusions into his privacy. See, *e. g.*, *Johnson* v. *United States*, 333 U. S. 10, 14; *McDonald* v. *United States*, 335 U. S. 451, 455; cf. *Giordenello* v. *United States*, [357 U. S. 480]. This purpose is realized by Rule 41 of the Federal Rules of Criminal Procedure, which implements the Fourth Amendment by requiring that an impartial magistrate determine from an affidavit showing probable cause whether information possessed by law-enforcement officers justifies the issuance of a search warrant. Were federal officers free to search without a warrant merely upon probable cause to believe that certain articles were within a home, the provisions of the Fourth Amendment would become empty phrases, and the protection it affords largely nullified." *Jones* v. *United States*, 357 U. S., at 497–498 (footnote omitted).

[27] See generally Rotenberg & Tanzer, Searching for the Person to be Seized, 35 Ohio St. L. J. 56 (1974).

[28] See n. 4, *supra*.

sion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present." *United States* v. *Reed,* 572 F. 2d 412, 423 (1978), cert. denied *sub nom. Goldsmith* v. *United States,* 439 U. S. 913.

We find this reasoning to be persuasive and in accord with this Court's Fourth Amendment decisions.

The majority of the New York Court of Appeals, however, suggested that there is a substantial difference in the relative intrusiveness of an entry to search for property and an entry to search for a person. See n. 13, *supra.* It is true that the area that may legally be searched is broader when executing a search warrant than when executing an arrest warrant in the home. See *Chimel* v. *California,* 395 U. S. 752. This difference may be more theoretical than real, however, because the police may need to check the entire premises for safety reasons, and sometimes they ignore the restrictions on searches incident to arrest.[29]

But the critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home. The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[a]t the very

---

[29] See, *e. g.,* the facts in Payton's case, n. 5, *supra.*

core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman* v. *United States,* 365 U. S. 505, 511. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

## III

Without contending that *United States* v. *Watson,* 423 U. S. 411, decided the question presented by these appeals, New York argues that the reasons that support the *Watson* holding require a similar result here. In *Watson* the Court relied on (a) the well-settled common-law rule that a warrantless arrest in a public place is valid if the arresting officer had probable cause to believe the suspect is a felon; [30] (b) the clear consensus among the States adhering to that well-settled common-law rule; [31] and (c) the expression of the judgment of Congress that such an arrest is "reasonable." [32] We con-

---

[30] "The cases construing the Fourth Amendment thus reflect the ancient common-law rule that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest. 10 Halsbury's Laws of England 344–345 (3d ed. 1955); 4 W. Blackstone, Commentaries *292; 1 J. Stephen, A History of the Criminal Law of England 193 (1883); 2 M. Hale, Pleas of the Crown *72–74; Wilgus, Arrests Without a Warrant, 22 Mich. L. Rev. 541, 547–550, 686–688 (1924); *Samuel* v. *Payne,* 1 Doug. 359, 99 Eng. Rep. 230 (K. B. 1780); *Beckwith* v. *Philby,* 6 Barn. & Cress. 635, 108 Eng. Rep. 585 (K. B. 1827)." 423 U. S., at 418–419.

[31] "The balance struck by the common law in generally authorizing felony arrests on probable cause, but without a warrant, has survived substantially intact. It appears in almost all of the States in the form of express statutory authorization." *Id.,* at 421–422.

[32] "This is the rule Congress has long directed its principal law enforcement officers to follow. Congress has plainly decided against condi-

sider each of these reasons as it applies to a warrantless entry into a home for the purpose of making a routine felony arrest.

### A

An examination of the common-law understanding of an officer's authority to arrest sheds light on the obviously relevant, if not entirely dispositive,[33] consideration of what the Framers of the Amendment might have thought to be reasonable. Initially, it should be noted that the common-law rules of arrest developed in legal contexts that substantially differ from the cases now before us. In these cases, which involve application of the exclusionary rule, the issue is whether cer-

---

tioning warrantless arrest power on proof of exigent circumstances." *Id.*, at 423.

The Court added in a footnote:

"Until 1951, 18 U. S. C. § 3052 conditioned the warrantless arrest powers of the agents of the Federal Bureau of Investigation on there being reasonable grounds to believe that the person would escape before a warrant could be obtained. The Act of Jan. 10, 1951, c. 1221, § 1, 64 Stat. 1239, eliminated this condition." *Id.*, at 423, n. 13.

[33] There are important differences between the common-law rules relating to searches and seizures and those that have evolved through the process of interpreting the Fourth Amendment in light of contemporary norms and conditions. For example, whereas the kinds of property subject to seizure under warrants had been limited to contraband and the fruits or instrumentalities of crime, see *Gouled* v. *United States*, 255 U. S. 298, 309, the category of property that may be seized, consistent with the Fourth Amendment, has been expanded to include mere evidence. *Warden* v. *Hayden*, 387 U. S. 294. Also, the prohibitions of the Amendment have been extended to protect against invasion by electronic eavesdropping of an individual's privacy in a phone booth not owned by him, *Katz* v. *United States*, 389 U. S. 347, even though the earlier law had focused on the physical invasion of the individual's person or property interests in the course of a seizure of tangible objects. See *Olmstead* v. *United States*, 277 U. S. 438, 466. Thus, this Court has not simply frozen into constitutional law those law enforcement practices that existed at the time of the Fourth Amendment's passage.

tain evidence is admissible at trial.[34] See *Weeks* v. *United States*, 232 U. S. 383. At common law, the question whether an arrest was authorized typically arose in civil damages actions for trespass or false arrest, in which a constable's authority to make the arrest was a defense. See, *e. g., Leach* v. *Money*, 19 How. St. Tr. 1001, 97 Eng. Rep. 1075 (K. B. 1765). Additionally, if an officer was killed while attempting to effect an arrest, the question whether the person resisting the arrest was guilty of murder or manslaughter turned on whether the officer was acting within the bounds of his authority. See M. Foster, Crown Law 308, 312 (1762). See also *West* v. *Cabell*, 153 U. S. 78, 85.

A study of the common law on the question whether a constable had the authority to make warrantless arrests in the home on mere suspicion of a felony—as distinguished from an officer's right to arrest for a crime committed in his presence—reveals a surprising lack of judicial decisions and a deep divergence among scholars.

The most cited evidence of the common-law rule consists of an equivocal dictum in a case actually involving the sheriff's authority to enter a home to effect service of civil process. In *Semayne's Case*, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195–196 (K. B. 1603), the Court stated:

> "In all cases when the King is party, the Sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the K.'s process, if otherwise he cannot enter. But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors; and that appears well by the stat. of Westm. 1. c. 17. (which is but an affirmance of the common law) as hereafter appears, for the law without a default in the owner abhors the destruc-

---

[34] The issue is not whether a defendant must stand trial, because he must do so even if the arrest is illegal. See *United States* v. *Crews, ante,* at 474.

tion or breaking of any house (which is for the habitation and safety of man) by which great damage and inconvenience might ensue to the party, when no default is in him; for perhaps he did not know of the process, of which, if he had notice, it is to be presumed that he would obey it, and that appears by the book in 18 E. 2. Execut. 252. where it is said, that the K.'s officer who comes to do execution, &c. may open the doors which are shut, and break them, if he cannot have the keys; which proves, that he ought first to demand them, 7 E. 3. 16." (Footnotes omitted.)

This passage has been read by some as describing an entry without a warrant. The context strongly implies, however, that the court was describing the extent of authority in executing the King's writ. This reading is confirmed by the phrase "either to arrest him, or to do *other* execution of the K.'s process" and by the further point that notice was necessary because the owner may "not know of the *process*." In any event, the passage surely cannot be said unambiguously to endorse warrantless entries.

The common-law commentators disagreed sharply on the subject.[35] Three distinct views were expressed. Lord Coke,

---

[35] Those modern commentators who have carefully studied the early works agree with that assessment. See ALI, A Model Code of Pre-Arraignment Procedure 308 (Prop. Off. Draft 1975) (hereinafter ALI Code); Blakey, The Rule of Announcement and Unlawful Entry: *Miller* v. *United States* and *Ker* v. *California,* 112 U. Pa. L. Rev. 499, 502 (1964); Comment, Forcible Entry to Effect a Warrantless Arrest—The Eroding Protection of the Castle, 82 Dick. L. Rev. 167, 168, n. 5 (1977); Note, The Constitutionality of Warrantless Home Arrests, 78 Colum. L. Rev. 1550, 1553 (1978) ("the major common-law commentators appear to be equally divided on the requirement of a warrant for a home arrest") (hereinafter Columbia Note); Recent Development, Warrantless Arrests by Police Survive a Constitutional Challenge—*United States* v. *Watson,* 14 Am. Crim. L. Rev. 193, 210–211 (1976). Accord, *Miller* v. *United States,* 357 U. S. 301, 307–308; *Accarino* v. *United States,* 85 U. S. App. D. C. 394, 402, 179 F. 2d 456, 464 (1949).

widely recognized by the American colonists "as the greatest authority of his time on the laws of England," [36] clearly viewed a warrantless entry for the purpose of arrest to be illegal.[37]

---

[36] "Foremost among the titles to be found in private libraries of the time were the works of Coke, the great expounder of Magna Carta, and similar books on English liberties. The inventory of the library of Arthur Spicer, who died in Richmond County, Virginia, in 1699, included Coke's *Institutes*, another work on Magna Carta, and a 'Table to Cooks Reports.' The library of Colonel Daniel McCarty, a wealthy planter and member of the Virginia House of Burgesses who died in Westmoreland County in 1724, included Coke's *Reports*, an abridgment of Coke's *Reports, Coke on Littleton*, and 'Rights of the Comons of England.' Captain Charles Colston, who died in Richmond County, Virginia, in 1724, and Captain Christopher Cocke, who died in Princess Anne County, Virginia, in 1716, each had copies of Coke's *Institutes*. That these libraries were typical is suggested by a study of the contents of approximately one hundred private libraries in colonial Virginia, which revealed that the most common law title found in these libraries was Coke's *Reports*. They were typical of other colonies, too. Another study, of the inventories of forty-seven libraries throughout the colonies between 1652 and 1791, found that of all the books on either law or politics in these libraries the most common was Coke's *Institutes* (found in 27 of the 47 libraries). The second most common title was a poor second; it was Grotius' *War and Peace*, found in 16 of the libraries (even Locke's *Two Treatises on Government* appeared in only 13 of the libraries).

"The popularity of Coke in the colonies is of no small significance. Coke himself had been at the eye of the storm in the clashes between King and Parliament in the early seventeenth century which did so much to shape the English Constitution. He rose to high office at the instance of the Crown—he was Speaker of the House of Commons and Attorney General under Queen Elizabeth, and James I made Coke first his Chief Justice of Common Pleas and then his Chief Justice of King's Bench. During this time Coke gained an unchallenged position as the greatest authority of his time on the laws of England, frequently burying an opponent with learned citations from early Year Books. Having been a champion of the Crown's interests, Coke (in a change of role that recalls the metamorphosis of Thomas à Becket) became instead the defender of the common law." A. Howard, The Road From Runnymede 118–119 (1968). (Footnotes omitted.)

[37] "[N]either the Constable, nor any other can break open any house for the apprehension of the party suspected or charged with the

Burn, Foster, and Hawkins agreed,[38] as did East and Russell, though the latter two qualified their opinions by stating that if an entry to arrest was made without a warrant, the officer was perhaps immune from liability for the trespass if the suspect was actually guilty.[39] Blackstone, Chitty, and Stephen took the opposite view, that entry to arrest without a warrant was legal,[40] though Stephen relied on Blackstone who, along with Chitty, in turn relied exclusively on Hale. But Hale's view was not quite so unequivocally expressed.[41]

---

felony. . . ." 4 E. Coke, Institutes *177. Coke also was of the opinion that only a King's indictment could justify the breaking of doors to effect an arrest founded on suspicion, and that not even a warrant issued by a justice of the peace was sufficient authority. *Ibid.* He was apparently alone in that view, however.

[38] 1 R. Burn, The Justice of the Peace and Parish Officer 87 (6th ed. 1758) ("where one lies under a probable suspicion only, and is not indicted, it seems the better opinion at this day (Mr. *Hawkins* says) that no one can justify the breaking open doors in order to apprehend him . . ."); M. Foster, Crown Law 321 (1762); 2 W. Hawkins, Pleas of the Crown 139 (6th ed. 1787): "But where one lies under a probable suspicion only, and is not indicted, it seems the better (d) opinion at this day, That no one can justify the breaking open doors in order to apprehend him." The contrary opinion of Hale, see n. 41, *infra,* is acknowledged among the authorities cited in the footnote (d).

[39] 1 E. East, Pleas of the Crown 322 (1806) ("[Y]et a bare suspicion of guilt against the party will not warrant a proceeding to this extremity [the breaking of doors], unless the officer be armed with a magistrate's warrant grounded on such suspicion. It will at least be at the peril of proving that the party so taken on suspicion was guilty."); 1 W. Russell, A Treatise on Crimes and Misdemeanors 745 (1819) (similar rule).

[40] 4 W. Blackstone, Commentaries *292; 1 J. Chitty, A Practical Treatise on the Criminal Law 23 (1816); 4 H. Stephen, New Commentaries on the Laws of England 359 (1845).

[41] 1 M. Hale, Pleas of the Crown 583 (1736); 2 *id.,* at 90–95. At page 92 of the latter volume, Hale writes that in the case where the constable suspects a person of a felony, "if the supposed offender fly and take house, and the door will not be opened upon demand of the constable and notification of his business, the constable may break the door, tho he have no warrant. 13 *E. 4. 9. a.*" Although it would appear that Hale might have

Further, Hale appears to rely solely on a statement in an early Yearbook, quoted in *Burdett* v. *Abbot,* 14 East 1, 155, 104 Eng. Rep. 501, 560 (K. B. 1811): [42]

> " 'that for felony, or suspicion of felony, a man may break open the house to take the felon; for it is for the commonweal to take them.' "

Considering the diversity of views just described, however, it is clear that the statement was never deemed authoritative. Indeed, in *Burdett,* the statement was described as an "extrajudicial opinion." *Ibid.*[43]

It is obvious that the common-law rule on warrantless home arrests was not as clear as the rule on arrests in public places. Indeed, particularly considering the prominence of Lord Coke, the weight of authority as it appeared to the Framers was to the effect that a warrant was required, or at the minimum that there were substantial risks in proceeding without one. The common-law sources display a sensitivity to privacy interests that could not have been lost on the Framers. The zealous and frequent repetition of the adage that a "man's house is his castle," made it abundantly clear that both in England [44]

---

meant to limit warrantless home arrests to cases of hot pursuit, the quoted passage has not typically been read that way.

[42] Apparently, the Yearbook in which the statement appears has never been fully translated into English.

[43] That assessment is consistent with the description by this Court of the holding of that Yearbook case in *Miller* v. *United States,* 357 U. S., at 307:

"As early as the 13th Yearbook of Edward IV (1461–1483), at folio 9, there is a recorded holding that it was unlawful for the sheriff to break the doors of a man's house to arrest him in a civil suit in debt or trespass, for the arrest was then only for the private interest of a party."

[44] Thus, in *Semayne's Case,* 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195 (K. B. 1603), the court stated: "That the house of every one is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose; and although the life of man is a thing precious and favoured in law; so that although a man kills another in his defence, or kills one *per infortun',* without any intent, yet it is felony, and in such case he

and in the Colonies "the freedom of one's house" was one of the most vital elements of English liberty.[45]

Thus, our study of the relevant common law does not provide the same guidance that was present in *Watson*. Whereas

---

shall forfeit his goods and chattels, for the great regard which the law has to a man's life; but if thieves come to a man's house to rob him, or murder, and the owner of his servants kill any of the thieves in defence of himself and his house, it is not felony, and he shall lose nothing, and therewith agree 3 E. 3. Coron. 303, & 305. & 26 Ass. pl. 23. So it is held in 21 H. 7. 39. every one may assemble his friends and neighbours to defend his house against violence: but he cannot assemble them to go with him to the market, or elsewhere for his safeguard against violence: and the reason of all this is, because *domus sua cuique est tutissimum refugium*." (Footnotes omitted.)

In the report of that case it is noted that although the sheriff may break open the door of a barn without warning to effect service of a writ, a demand and refusal must precede entry into a dwelling house. *Id.*, at 91b, n. (c), 77 Eng. Rep., at 196, n. (c):

"And this privilege is confined to a man's dwelling-house, or out-house adjoining thereto, for the sheriff on a *fieri facias* may break open the door of a barn standing at a distance from the dwelling-house, without requesting the owner to open the door, in the same manner as he may enter a close. *Penton* v. *Brown*, 2 Keb. 698, S. C. 1 Sid. 186."

[45] "Now one of the most essential branches of English liberty is the freedom of one's house. A man's house is his castle; and while he is quiet, he is as well guarded as a prince in his castle. This writ, if it should be declared legal, would totally annihilate this privilege." 2 Legal Papers of John Adams 142 (L. Wroth & H. Zobel eds. 1965).

We have long recognized the relevance of the common law's special regard for the home to. the development of Fourth Amendment jurisprudence. See, *e. g., Weeks* v. *United States*, 232 U. S. 383, 390:

"Judge Cooley, in his Constitutional Limitations, pp. 425, 426, in treating of this feature of our Constitution, said: 'The maxim that "every man's house is his castle," is made a part of our constitutional law in the clauses prohibiting unreasonable searches and seizures, and has always been looked upon as of high value to the citizen.' 'Accordingly,' says Lieber in his work on Civil Liberty and Self-Government, 62, in speaking of the English law in this respect, 'no man's house can be forcibly opened, or he or his goods be carried away after it has thus been forced, except in cases of felony, and then the sheriff must be furnished with a warrant, and take

the rule concerning the validity of an arrest in a public place was supported by cases directly in point and by the unanimous views of the commentators, we have found no direct authority supporting forcible entries into a home to make a routine arrest and the weight of the scholarly opinion is somewhat to the contrary. Indeed, the absence of any 17th- or 18th-century English cases directly in point, together with the unequivocal endorsement of the tenet that "a man's house is his castle," strongly suggests that the prevailing practice was not to make such arrests except in hot pursuit or when authorized by a warrant. Cf. *Agnello* v. *United States,* 269 U. S. 20, 33. In all events, the issue is not one that can be said to have been definitively settled by the common law at the time the Fourth Amendment was adopted.

### B

A majority of the States that have taken a position on the question permit warrantless entry into the home to arrest even in the absence of exigent circumstances. At this time, 24 States permit such warrantless entries; [46] 15 States clearly

---

great care lest he commit a trespass. This principle is jealously insisted upon."

Although the quote from Lieber concerning warrantless arrests in the home is on point for today's cases, it was dictum in *Weeks.* For that case involved a warrantless arrest in a public place, and a warrantless search of Week's home in his absence.

[46] Twenty-three States authorize such entries by statute. See Ala. Code § 15–10–4 (1975); Alaska Stat. Ann. § 12.25.100 (1972); Ark. Stat. Ann. § 43–414 (1977); Fla. Stat. § 901.19 (1979); Haw. Rev. Stat. § 803–11 (1977); Idaho Code § 19–611 (1979); Ill. Rev. Stat., ch. 38, § 107—5 (d) (1971); La. Code Crim. Proc. Ann., Art. 224 (West 1967); Mich. Comp. Laws § 764.21 (1970); Minn. Stat. § 629.34 (1978); Miss. Code Ann. § 99–3–11 (1973); Mo. Rev. Stat. § 544.200 (1978); Neb. Rev. Stat. § 29–411 (1975); Nev. Rev. Stat. § 171.138 (1977); N. Y. Crim. Proc. Law §§ 140.15 (4), 120.80 (4), (5) (McKinney 1971); N. C. Gen. Stat. § 15A–401 (e) (1978); N. D. Cent. Code § 29–06–14 (1974); Ohio Rev. Code Ann. § 2935.12 (1975); Okla. Stat., Tit. 22, § 197 (1971); S. D. Comp. Laws Ann. § 23A–3–5 (1979); Tenn. Code Ann. § 40–807 (1975); Utah Code

prohibit them, though 3 States do so on federal constitutional grounds alone; [47] and 11 States have apparently taken no position on the question.[48]

But these current figures reflect a significant decline during the last decade in the number of States permitting warrantless entries for arrest. Recent dicta in this Court raising questions about the practice, see n. 1, *supra,* and Federal Courts of Appeals' decisions on point, see n. 4, *supra,* have led state courts to focus on the issue. Virtually all of the state courts that have had to confront the constitutional issue directly have held warrantless entries into the home to arrest to be invalid in the absence of exigent circumstances. See nn. 2, 3, *supra.* Three state courts have relied on Fourth Amendment

Ann. § 77–13–12 (Repl. 1978); Wash. Rev. Code § 10.31.040 (1976). One State has authorized warrantless arrest entries by judicial decision. See *Shanks* v. *Commonwealth,* 463 S. W. 2d 312, 315 (Ky. App. 1971).

A number of courts in these States, though not directly deciding the issue, have recognized that the constitutionality of such entries is open to question. See *People* v. *Wolgemuth,* 69 Ill. 2d 154, 370 N. E. 2d 1067 (1977), cert. denied, 436 U. S. 908; *State* v. *Ranker,* 343 So. 2d 189 (La. 1977) (citing both State and Federal Constitutions); *State* v. *Lasley,* 306 Minn. 224, 236 N. W. 2d 604 (1975), cert. denied, 429 U. S. 1077; *State* v. *Novak,* 428 S. W. 2d 585 (Mo. 1968); *State* v. *Page,* 277 N. W. 2d 112 (N. D. 1979); *State* v. *Max,* 263 N. W. 2d 685 (S. D. 1978).

[47] Four States prohibit warrantless arrests in the home by statute, see Ga. Code §§ 27–205, 27–207 (1978) (also prohibits warrantless arrests outside the home absent exigency); Ind. Code §§ 35–1–19–4, 35–1–19–6 (1976); Mont. Code Ann. § 46–6–401 (1979) (same as Georgia); S. C. Code § 23–15–60 (1976); 1 by state common law, see *United States* v. *Hall,* 468 F. Supp. 123, 131, n. 16 (ED Tex. 1979); *Moore* v. *State,* 149 Tex. Crim. 229, 235–236, 193 S. W. 2d 204, 207 (1946); and 10 on constitutional grounds, see n. 3, *supra.*

[48] Connecticut, Delaware, Maine, Maryland, New Hampshire, New Jersey, New Mexico, Rhode Island, Vermont, Virginia and Wyoming. The courts of three of the above-listed States have recognized that the constitutionality of warrantless home arrest is subject to question. See *State* v. *Anonymous,* 34 Conn. Supp. 531, 375 A. 2d 417 (Super. Ct., App. Sess. 1977); *Nilson* v. *State,* 272 Md. 179, 321 A. 2d 301 (1974); *Palmigiano* v. *Mullen,* 119 R. I. 363, 377 A. 2d 242 (1977).

grounds alone, while seven have squarely placed their decisions on both federal and state constitutional grounds.[49] A number of other state courts, though not having had to confront the issue directly, have recognized the serious nature of the constitutional question.[50] Apparently, only the Supreme Court of Florida and the New York Court of Appeals in this case have expressly upheld warrantless entries to arrest in the face of a constitutional challenge.[51]

A longstanding, widespread practice is not immune from constitutional scrutiny. But neither is it to be lightly brushed aside. This is particularly so when the constitutional standard is as amorphous as the word "reasonable," and when custom and contemporary norms necessarily play such a large role in the constitutional analysis. In this case, although the weight of state-law authority is clear, there is by no means the kind of virtual unanimity on this question that was present in *United States* v. *Watson,* with regard to warrantless arrests in public places. See 423 U. S., at 422–423. Only 24 of the 50 States currently sanction warrantless entries into the home to arrest, see nn. 46–48, *supra,* and there is an obvious declining trend. Further, the strength of the trend is greater than the numbers alone indicate. Seven state courts have recently held that warrantless home arrests violate their respective *State* Constitutions. See n. 3, *supra.* That is significant because by invoking a state constitutional provision, a state court immunizes its decision from review by this Court.[52] This heightened degree of immutability underscores the depth of the principle underlying the result.

---

[49] See cases cited in n. 3, *supra.*

[50] See cases cited in nn. 46, 48, *supra.*

[51] See n. 2, *supra.*

[52] See, *e. g., Herb* v. *Pitcairn,* 324 U. S. 117, 125–126. See generally Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489 (1977).

## C

No congressional determination that warrantless entries into the home are "reasonable" has been called to our attention. None of the federal statutes cited in the *Watson* opinion reflects any such legislative judgment.[53] Thus, that support for the *Watson* holding finds no counterpart in this case.

MR. JUSTICE POWELL, concurring in *United States* v. *Watson, supra,* at 429, stated:

> "But logic sometimes must defer to history and experience. The Court's opinion emphasizes the historical sanction accorded warrantless felony arrests [in public places]."

In this case, however, neither history nor this Nation's experience requires us to disregard the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.[54]

---

[53] The statute referred to in n. 32, *supra,* provides:

"The Director, Associate Director, Assistant to the Director, Assistant Directors, inspectors, and agents of the Federal Bureau of Investigation of the Department of Justice may carry firearms, serve warrants and subpoenas issued under the authority of the United States and make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony." 18 U. S. C. § 3052.

It says nothing either way about executing warrantless arrests in the home. See also ALI Code, at 308; Columbia Note 1554–1555, n. 26.

[54] There can be no doubt that Pitt's address in the House of Commons in March 1763 echoed and re-echoed throughout the Colonies:

" 'The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!' " *Miller* v. *United States,* 357 U. S., at 307.

## IV

The parties have argued at some length about the practical consequences of a warrant requirement as a precondition to a felony arrest in the home.[55] In the absence of any evidence that effective law enforcement has suffered in those States that already have such a requirement, see nn. 3, 47, *supra,* we are inclined to view such arguments with skepticism. More fundamentally, however, such arguments of policy must give way to a constitutional command that we consider to be unequivocal.

Finally, we note the State's suggestion that only a search warrant based on probable cause to believe the suspect is at home at a given time can adequately protect the privacy interests at stake, and since such a warrant requirement is manifestly impractical, there need be no warrant of any kind. We find this ingenious argument unpersuasive. It is true that an arrest warrant requirement may afford less protection than a search warrant requirement, but it will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen. If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reason-

---

[55] The State of New York argues that the warrant requirement will pressure police to seek warrants and make arrests too hurriedly, thus increasing the likelihood of arresting innocent people; that it will divert scarce resources thereby interfering with the police's ability to do thorough investigations; that it will penalize the police for deliberate planning; and that it will lead to more injuries. Appellants counter that careful planning is possible and that the police need not rush to get a warrant, because if an exigency arises necessitating immediate arrest in the course of an orderly investigation, arrest without a warrant is permissible; that the warrant procedure will decrease the likelihood that an innocent person will be arrested; that the inconvenience of obtaining a warrant and the potential for diversion of resources is exaggerated by the State; and that there is no basis for the assertion that the time required to obtain a warrant would create peril.

able to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.

Because no arrest warrant was obtained in either of these cases, the judgments must be reversed and the cases remanded to the New York Court of Appeals for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE BLACKMUN, concurring:

I joined the Court's opinion in *United States* v. *Watson,* 423 U. S. 411 (1976), upholding, on probable cause, the warrantless arrest in a public place. I, of course, am still of the view that the decision in *Watson* is correct. The Court's balancing of the competing governmental and individual interests properly occasioned that result. Where, however, the warrantless arrest is in the suspect's home, that same balancing requires that, absent exigent circumstances, the result be the other way. The suspect's interest in the sanctity of his home then outweighs the governmental interests.

I therefore join the Court's opinion, firm in the conviction that the result in *Watson* and the result here, although opposite, are fully justified by history and by the Fourth Amendment.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

The Court today holds that absent exigent circumstances officers may never enter a home during the daytime to arrest for a dangerous felony unless they have first obtained a warrant. This hard-and-fast rule, founded on erroneous assumptions concerning the intrusiveness of home arrest entries,

finds little or no support in the common law or in the text and history of the Fourth Amendment. I respectfully dissent.

## I

As the Court notes, *ante,* at 591, the common law of searches and seizures, as evolved in England, as transported to the Colonies, and as developed among the States, is highly relevant to the present scope of the Fourth Amendment. *United States* v. *Watson,* 423 U. S. 411, 418–422 (1976); *id.,* at 425, 429 (POWELL, J., concurring); *Gerstein* v. *Pugh,* 420 U. S. 103, 111, 114 (1975); *Carroll* v. *United States,* 267 U. S. 132, 149–153 (1925); *Bad Elk* v. *United States,* 177 U. S. 529, 534–535 (1900); *Boyd* v. *United States,* 116 U. S. 616, 622–630 (1886); *Kurtz* v. *Moffitt,* 115 U. S. 487, 498–499 (1885). Today's decision virtually ignores these centuries of common-law development, and distorts the historical meaning of the Fourth Amendment, by proclaiming for the first time a rigid warrant requirement for all nonexigent home arrest entries.

## A

As early as the 15th century the common law had limited the Crown's power to invade a private dwelling in order to arrest. A Year Book case of 1455 held that in civil cases the sheriff could not break doors to arrest for debt or trespass, for the arrest was then only in the private interests of a party. Y. B. 13 Edw. IV, 9a. To the same effect is *Semayne's Case,* 5 Co. Rep. 91a, 77 Eng. Rep. 194 (K. B. 1603). The holdings of these cases were condensed in the maxim that "every man's house is his castle." H. Broom, Legal Maxims *321–*329.

However, this limitation on the Crown's power applied only to private civil actions. In cases directly involving the Crown, the rule was that "[t]he king's keys unlock all doors." Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 798, 800 (1924). The Year Book case cited above stated a different rule for criminal cases: for a felony, or suspicion of felony, one may break into the dwelling house to take the felon, for

it is for the common weal and to the interest of the King to take him. Likewise, *Semayne's Case* stated in dictum:

> "In all cases when the King is party, the Sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the K[ing]'s process, if otherwise he cannot enter." 5 Co. Rep., at 91b, 77 Eng. Rep., at 195.

Although these cases established the Crown's power to enter a dwelling in criminal cases, they did not directly address the question of whether a constable could break doors to arrest without authorization by a warrant. At common law, the constable's office was twofold. As conservator of the peace, he possessed, *virtute officii,* a "great original and inherent authority with regard to arrests," 4 W. Blackstone, Commentaries *292 (hereinafter Blackstone), and could "without any other warrant but from [himself] arrest felons, and those that [were] probably suspected of felonies," 2 M. Hale, Pleas of the Crown 85 (1736) (hereinafter Hale); see *United States* v. *Watson, supra,* at 418–419. Second, as a subordinate public official, the constable performed ministerial tasks under the authorization and direction of superior officers. See 1 R. Burn, The Justice of the Peace and Parish Officer 295 (6th ed. 1758) (hereinafter Burn); 2 W. Hawkins, Pleas of the Crown 130–132 (6th ed. 1787) (hereinafter Hawkins). It was in this capacity that the constable executed warrants issued by justices of the peace. The warrant authorized the constable to take actions beyond his inherent powers.[1] It also ensured that he actually carried out his instructions, by giving him clear notice of his duty, for the breach of which he could be punished, 4 Blackstone *291; 1 Burn 295; 2 Hale 88, and by relieving him from civil liability even if probable cause to

---

[1] For example, a constable could arrest for breaches of the peace committed outside his presence only under authority of a warrant. *Bad Elk* v. *United States,* 177 U. S. 529, 534–535 (1900); 1 Burn 294; 2 Hale 90; 2 Hawkins 130.

arrest were lacking, 4 Blackstone *291; 1 Burn 295–296; M. Dalton, The Country Justice 579 (1727 ed.) (hereinafter Dalton); 2 Hawkins 132–133. For this reason, warrants were sometimes issued even when the act commanded was within the constable's inherent authority. Dalton 576.

As the Court notes, commentators have differed as to the scope of the constable's inherent authority, when not acting under a warrant, to break doors in order to arrest. Probably the majority of commentators would permit arrest entries on probable suspicion even if the person arrested were not in fact guilty. 4 Blackstone *292; 1 Burn 87–88;[2] 1 J. Chitty, Criminal Law 23 (1816) (hereinafter Chitty); Dalton 426; 1 Hale 583; 2 id., at 90–94. These authors, in short, would have permitted the type of home arrest entries that occurred in the present cases. The inclusion of Blackstone in this list is particularly significant in light of his profound impact on the minds of the colonists at the time of the framing of the Constitution and the ratification of the Bill of Rights.

A second school of thought, on which the Court relies, held that the constable could not break doors on mere "bare suspicion." M. Foster, Crown Law 321 (1762); 2 Hawkins 139; 1 E. East, Pleas of the Crown 321–322 (1806); 1 W. Russell, Treatise on Crimes and Misdemeanors 745 (1819) (hereinafter Russell). Cf. 4 E. Coke, Institutes *177. Although this doc-

---

[2] The Court cites Burn for the proposition that home arrests on mere suspicion are invalid. Ante, at 595, n. 38. In fact, Burn appears to be of the opposite view. Burn contrasts the case of arrests by private citizens, which cannot be justified unless the person arrested was actually guilty of felony, with that of arrests by constables:

"But a constable in such case may justify, and the reason of the difference is this: because that in the former case it is but a thing permitted to private persons to arrest for suspicion, and they are not punishable if they omit it, and therefore they cannot break open doors; but in case of a constable, he is punishable if he omit it upon complaint." 1 Burn 87–88 (emphasis in original).

Burn apparently refers to a constable's duty to act without a warrant on complaint of a citizen.

trine imposed somewhat greater limitations on the constable's inherent power, it does not support the Court's hard-and-fast rule against warrantless nonexigent home entries upon probable cause. East and Russell state explicitly what Foster and Hawkins imply: although mere "bare suspicion" will not justify breaking doors, the constable's action would be justifiable if the person arrested were *in fact* guilty of a felony. These authorities can be read as imposing a somewhat more stringent requirement of probable cause for arrests in the home than for arrests elsewhere. But they would not bar nonexigent, warrantless home arrests in all circumstances, as the Court does today. And Coke is flatly contrary to the Court's rule requiring a warrant, since he believed that even a warrant would not justify an arrest entry until the suspect had been indicted.

Finally, it bears noting that the doctrine against home entries on bare suspicion developed in a period in which the validity of *any* arrest on bare suspicion—even one occurring outside the home—was open to question. Not until Lord Mansfield's decision in *Samuel* v. *Payne,* 1 Doug. 359, 99 Eng. Rep. 230 (K. B. 1780), was it definitively established that the constable could arrest on suspicion even if it turned out that no felony had been committed. To the extent that the commentators relied on by the Court reasoned from any general rule against warrantless arrests based on bare suspicion, the rationale for their position did not survive *Samuel* v. *Payne.*

### B

The history of the Fourth Amendment does not support the rule announced today. At the time that Amendment was adopted the constable possessed broad inherent powers to arrest. The limitations on those powers derived, not from a warrant "requirement," but from the generally ministerial nature of the constable's office at common law. Far from restricting the constable's arrest power, the institution of the

warrant was used to expand that authority by giving the constable delegated powers of a superior officer such as a justice of the peace. Hence at the time of the Bill of Rights, the warrant functioned as a powerful tool of law enforcement rather than as a protection for the rights of criminal suspects.

In fact, it was the abusive use of the warrant power, rather than any excessive zeal in the discharge of peace officers' inherent authority, that precipitated the Fourth Amendment. That Amendment grew out of colonial opposition to the infamous general warrants known as writs of assistance, which empowered customs officers to search at will, and to break open receptacles or packages, wherever they suspected uncustomed goods to be. *United States* v. *Chadwick,* 433 U. S. 1, 7–8 (1977); N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 51–78 (1937) (hereinafter Lasson). The writs did not specify where searches could occur and they remained effective throughout the sovereign's lifetime. *Id.,* at 54. In effect, the writs placed complete discretion in the hands of executing officials. Customs searches of this type were beyond the inherent power of common-law officials and were the subject of court suits when performed by colonial customs agents not acting pursuant to a writ. *Id.,* at 55.

The common law was the colonists' ally in their struggle against writs of assistance. Hale and Blackstone had condemned general warrants, 1 Hale 580; 4 Blackstone *291, and fresh in the colonists' minds were decisions granting recovery to parties arrested or searched under general warrants on suspicion of seditious libel. *Entick* v. *Carrington,* 19 How. St. Tr. 1029, 95 Eng. Rep. 807 (K. B. 1765); *Huckle* v. *Money,* 2 Wils. 205, 95 Eng. Rep. 768 (K. B. 1763); *Wilkes* v. *Wood,* 19 How. St. Tr. 1153, 98 Eng. Rep. 489 (K. B. 1763). When James Otis, Jr., delivered his courtroom oration against writs of assistance in 1761, he looked to the common law in asserting that the writs, if not construed specially, were void as a

form of general warrant. 2 Legal Papers of John Adams 139–144 (L. Wroth & H. Zobel eds. 1965).[3]

Given the colonists' high regard for the common law, it is indeed unlikely that the Framers of the Fourth Amendment intended to derogate from the constable's inherent common-law authority. Such an argument was rejected in the important early case of *Rohan* v. *Sawin*, 59 Mass. 281, 284–285 (1851):

> "It has been sometimes contended, that an arrest of this character, without a warrant, was a violation of the great fundamental principles of our national and state constitutions, forbidding unreasonable searches and arrests, except by warrant founded upon a complaint made under oath. Those provisions doubtless had another and different purpose, being in restraint of general warrants to make searches, and requiring warrants to issue only upon a complaint made under oath. They do not conflict with the authority of constables or other peace-officers . . . to arrest without warrant those who have committed felonies. The public safety, and the due apprehension of criminals, charged with heinous offences, imperiously require that such arrests should be made without warrant by officers of the law." [4]

---

[3] The Court cites Pitt's March 1763 oration in the House of Commons as indicating an "overriding respect for the sanctity of the home." *Ante,* at 601, and n. 54. But this speech was in opposition to a proposed excise tax on cider. 15 Parliamentary History of England 1307 (1813). Nothing in it remotely suggests that Pitt objected to the constable's traditional power of warrantless entry into dwellings to arrest for felony.

[4] See also *North* v. *People,* 139 Ill. 81, 105, 28 N. E. 966, 972 (1891) (Warrant Clause "does not abridge the right to arrest without warrant, in cases where such arrest could be lawfully made at common law before the adoption of the present constitution"); *Wakely* v. *Hart,* 6 Binn. 316, 319 (Pa. 1814) (rules permitting arrest without a warrant are "principles of the common law, essential to the welfare of society, and not intended to be altered or impaired by the constitution. The whole section indeed was nothing more than an affirmance of the common law. . .").

That the Framers were concerned about warrants, and not about the constable's inherent power to arrest, is also evident from the text and legislative history of the Fourth Amendment. That provision first reaffirms the basic principle of common law, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." The Amendment does not here purport to limit or restrict the peace officer's inherent power to arrest or search, but rather assumes an existing right against actions in excess of that inherent power and ensures that it remain inviolable. As I have noted, it was not generally considered "unreasonable" at common law for officers to break doors in making warrantless felony arrests. The Amendment's second clause is directed at the actions of officers taken in their ministerial capacity pursuant to writs of assistance and other warrants. In contrast to the first Clause, the second Clause does purport to alter colonial practice: "and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

That the Fourth Amendment was directed towards safeguarding the rights at common law, and restricting the warrant practice which gave officers vast new powers beyond their inherent authority, is evident from the legislative history of that provision. As originally drafted by James Madison, it was directed *only* at warrants; so deeply ingrained was the basic common-law premise that it was not even expressed:

> "The rights of the people to be secured in their persons[,] their houses, their papers, and their other property, from all unreasonable searches and seizures, shall not be violated by warrants issued without probable cause, supported by oath or affirmation, or not particularly describing the places to be searched, or the persons or things to be seized." 1 Annals of Cong. 452 (1789).

The Committee of Eleven reported the provision as follows:

> "The right of the people to be secured in their persons, houses, papers, and effects, shall not be violated by warrants issuing without probable cause, supported by oath or affirmation, and not particularly describing the place to be searched, and the persons or things to be seized." *Id.*, at 783.

The present language was adopted virtually at the last moment by the Committee of Three, which had been appointed only to arrange the Amendments rather than to make substantive changes in them. Lasson 101. The Amendment passed the House; but "the House seems never to have consciously agreed to the Amendment in its present form." *Ibid.* In any event, because the sanctity of the common-law protections was assumed from the start, it is evident that the change made by the Committee of Three was a cautionary measure without substantive content.

In sum, the background, text, and legislative history of the Fourth Amendment demonstrate that the purpose was to restrict the abuses that had developed with respect to warrants; the Amendment preserved common-law rules of arrest. Because it was not considered generally unreasonable at common law for officers to break doors to effect a warrantless felony arrest, I do not believe that the Fourth Amendment was intended to outlaw the types of police conduct at issue in the present cases.

## C

Probably because warrantless arrest entries were so firmly accepted at common law, there is apparently no recorded constitutional challenge to such entries in the 19th-century cases. Common-law authorities on both sides of the Atlantic, however, continued to endorse the validity of such arrests. *E. g.,* 1 J. Bishop, Commentaries on the Law of Criminal Procedure §§ 195–199 (2d ed. 1872); 1 Chitty 23; 1 J. Colby, A Practical Treatise upon the Criminal Law and Practice of the State

of New York 73–74 (1868); F. Heard, A Practical Treatise on the Authority and Duties of Trial Justices, District, Police, and Municipal Courts, in Criminal Cases 135, 148 (1879); 1 Russell 745. Like their predecessors, these authorities conflicted as to whether the officer would be liable in damages if it were shown that the person arrested was not guilty of a felony. But all agreed that warrantless home entries would be permissible in at least some circumstances. None endorsed the rule of today's decision that a warrant is always required, absent exigent circumstances, to effect a home arrest.

Apparently the first official pronouncement on the validity of warrantless home arrests came with the adoption of state codes of criminal procedure in the latter 19th and early 20th centuries. The great majority of these codes accepted and endorsed the inherent authority of peace officers to enter dwellings in order to arrest felons. By 1931, 24 of 29 state codes authorized such warrantless arrest entries.[5] By 1975, 31 of 37 state codes authorized warrantless home felony arrests.[6] The American Law Institute included such authority in its model legislation in 1931 and again in 1975.[7]

The first direct judicial holding on the subject of warrantless home arrests seems to have been *Commonwealth* v. *Phelps,* 209 Mass. 396, 95 N. E. 868 (1911). The holding in this case that such entries were constitutional became the settled rule in the States for much of the rest of the century. See Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 798, 803 (1924). Opinions of this Court also assumed that such arrests were constitutional.[8]

---

[5] American Law Institute, Code of Criminal Procedure 254–255 (Off. Draft 1931) (hereinafter Code).

[6] American Law Institute, A Model Code of Pre-Arraignment Procedure App. XI (Prop. Off. Draft 1975) (hereinafter Model Code).

[7] Code §§ 21, 28; Model Code § 120.6 (1).

[8] See *Johnson* v. *United States,* 333 U. S. 10, 15 (1948) (stating in dictum that officers could have entered hotel room without a warrant in

This Court apparently first questioned the reasonableness of warrantless nonexigent entries to arrest in *Jones* v. *United States,* 357 U. S. 493, 499–500 (1958), noting in dictum that such entries would pose a "grave constitutional question" if carried out at night.[9] In *Coolidge* v. *New Hampshire,* 403 U. S. 443, 480 (1971), the Court stated, again in dictum:

> "[I]f [it] is correct that it has generally been assumed that the Fourth Amendment is not violated by the warrantless entry of a man's house for purposes of arrest, it might be wise to re-examine the assumption. Such a re-examination 'would confront us with a grave constitutional question, namely, whether the forcible nighttime entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought, is consistent with the Fourth Amendment.' *Jones* v. *United States,* 357 U. S., at 499–500."

Although *Coolidge* and *Jones* both referred to the special problem of warrantless entries during the nighttime,[10] it is not surprising that state and federal courts have tended to read those dicta as suggesting a broader infirmity applying to daytime entries also, and that the majority of recent decisions have been against the constitutionality of all types of warrantless, nonexigent home arrest entries. As the Court con-

---

order to make an arrest "for a crime committed in the presence of the arresting officer or for a felony of which he had reasonable cause to believe defendant guilty") (footnote omitted); *Ker* v. *California,* 374 U. S. 23, 38 (1963) (plurality opinion); *Sabbath* v. *United States,* 391 U. S. 585, 588 (1968).

[9] One Court of Appeals had previously held such entries unconstitutional. *Accarino* v. *United States,* 85 U. S. App. D. C. 394, 179 F. 2d 456 (1949).

[10] As I discuss *infra,* there may well be greater constitutional problems with nighttime entries.

cedes, however, even despite *Coolidge* and *Jones* it remains the case that

"[a] majority of the States that have taken a position on the question permit warrantless entry into the home to arrest even in the absence of exigent circumstances. At this time, 24 States permit such warrantless entries; 15 States clearly prohibit them, though 3 States do so on federal constitutional grounds alone; and 11 States have apparently taken no position on the question." *Ante,* at 598–599 (footnotes omitted).

This consensus, in the face of seemingly contrary dicta from this Court, is entitled to more deference than the Court today provides. Cf. *United States* v. *Watson,* 423 U. S. 411 (1976).

## D

In the present cases, as in *Watson,* the applicable federal statutes are relevant to the reasonableness of the type of arrest in question. Under 18 U. S. C. § 3052, specified federal agents may "make arrests without warrants for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States, if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony." On its face this provision authorizes federal agents to make warrantless arrests anywhere, including the home. Particularly in light of the accepted rule at common law and among the States permitting warrantless home arrests, the absence of any explicit exception for the home from § 3052 is persuasive evidence that Congress intended to authorize warrantless arrests there as well as elsewhere.

Further, Congress has not been unaware of the special problems involved in police entries into the home. In 18 U. S. C. § 3109, it provided that

"[t]he officer may break open any outer or inner door or window of a house, or any part of a house, or anything

therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance. . . ."
See *Miller* v. *United States,* 357 U. S. 301 (1958). In explicitly providing authority to enter when executing a search warrant, Congress surely did not intend to derogate from the officers' power to effect an arrest entry either with or without a warrant. Rather, Congress apparently assumed that this power was so firmly established either at common law or by statute that no explicit grant of arrest authority was required in § 3109. In short, although the Court purports to find no guidance in the relevant federal statutes, I believe that fairly read they authorize the type of police conduct at issue in these cases.

## II

### A

Today's decision rests, in large measure, on the premise that warrantless arrest entries constitute a particularly severe invasion of personal privacy. I do not dispute that the home is generally a very private area or that the common law displayed a special "reverence . . . for the individual's right of privacy in his house." *Miller* v. *United States, supra,* at 313. However, the Fourth Amendment is concerned with protecting people, not places, and no talismanic significance is given to the fact that an arrest occurs in the home rather than elsewhere. Cf. *Ybarra* v. *Illinois,* 444 U. S. 85 (1979); *Katz* v. *United States,* 389 U. S. 347, 351 (1967); *Boyd* v. *United States,* 116 U. S., at 630. It is necessary in each case to assess realistically the actual extent of invasion of constitutionally protected privacy. Further, as MR. JUSTICE POWELL observed in *United States* v. *Watson, supra,* at 428 (concurring opinion), all arrests involve serious intrusions into an individual's privacy and dignity. Yet we settled in *Watson* that the intrusiveness of a public arrest is not enough to mandate the obtaining of a warrant. The inquiry in the present case, therefore, is whether the incremen-

tal intrusiveness that results from an arrest's being made *in the dwelling* is enough to support an inflexible constitutional rule requiring warrants for such arrests whenever exigent circumstances are not present.

Today's decision ignores the carefully crafted restrictions on the common-law power of arrest entry and thereby overestimates the dangers inherent in that practice. At common law, absent exigent circumstances, entries to arrest could be made only for felony. Even in cases of felony, the officers were required to announce their presence, demand admission, and be refused entry before they were entitled to break doors.[11] Further, it seems generally accepted that entries could be made only during daylight hours.[12] And, in my view, the officer entering to arrest must have reasonable grounds to believe, not only that the arrestee has committed a crime, but also that the person suspected is present in the house at the time of the entry.[13]

These four restrictions on home arrests—felony, knock and announce, daytime, and stringent probable cause—constitute powerful and complementary protections for the privacy interests associated with the home. The felony requirement guards against abusive or arbitrary enforcement and ensures that invasions of the home occur only in case of the most

---

[11] *Miller* v. *United States,* 357 U. S. 301, 308 (1958); *Semayne's Case,* 5 Co. Rep. 91a, 77 Eng. Rep. 194 (K. B. 1603); Dalton 427; 2 Hale 90; 2 Hawkins 138.

[12] Model Code § 120.6 (3). Cf. *Jones* v. *United States,* 357 U. S. 493, 499–500 (1958); *Coolidge* v. *New Hampshire,* 403 U. S. 443, 480 (1971).

[13] I do not necessarily disagree with the Court's discussion of the quantum of probable cause necessary to make a valid home arrest. The Court indicates that only an arrest warrant, and not a search warrant, is required. *Ante,* at 602–603. To obtain the warrant, therefore, the officers need only show probable cause that a crime has been committed and that the suspect committed it. However, under today's decision, the officers apparently need an extra increment of probable cause when executing the arrest warrant, namely, grounds to believe that the suspect is within the dwelling. *Ibid.*

serious crimes. The knock-and-announce and daytime requirements protect individuals against the fear, humiliation, and embarrassment of being roused from their beds in states of partial or complete undress. And these requirements allow the arrestee to surrender at his front door, thereby maintaining his dignity and preventing the officers from entering other rooms of the dwelling. The stringent probable-cause requirement would help ensure against the possibility that the police would enter when the suspect was not home, and, in searching for him, frighten members of the family or ransack parts of the house, seizing items in plain view. In short, these requirements, taken together, permit an individual suspected of a serious crime to surrender at the front door of his dwelling and thereby avoid most of the humiliation and indignity that the Court seems to believe necessarily accompany a house arrest entry. Such a front-door arrest, in my view, is no more intrusive on personal privacy than the public warrantless arrests which we found to pass constitutional muster in *Watson*.[14]

All of these limitations on warrantless arrest entries are satisfied on the facts of the present cases. The arrests here were for serious felonies—murder and armed robbery—and both occurred during daylight hours. The authorizing statutes required that the police announce their business and demand entry; neither Payton nor Riddick makes any contention that these statutory requirements were not fulfilled. And it is not argued that the police had no probable cause to believe that both Payton and Riddick were in their dwellings at the time of the entries. Today's decision, therefore, sweeps away any possibility that warrantless home entries might be permitted in some limited situations other than those in which

---

[14] If the suspect flees or hides, of course, the intrusiveness of the entry will be somewhat greater; but the policeman's hands should not be tied merely because of the possibility that the suspect will fail to cooperate with legitimate actions by law enforcement personnel.

exigent circumstances are present. The Court substitutes, in one sweeping decision, a rigid constitutional rule in place of the common-law approach, evolved over hundreds of years, which achieved a flexible accommodation between the demands of personal privacy and the legitimate needs of law enforcement.

A rule permitting warrantless arrest entries would not pose a danger that officers would use their entry power as a pretext to justify an otherwise invalid warrantless search. A search pursuant to a warrantless arrest entry will rarely, if ever, be as complete as one under authority of a search warrant. If the suspect surrenders at the door, the officers may not enter other rooms. Of course, the suspect may flee or hide, or may not be at home, but the officers cannot anticipate the first two of these possibilities and the last is unlikely given the requirement of probable cause to believe that the suspect is at home. Even when officers are justified in searching other rooms, they may seize only items within the arrestee's possession or immediate control or items in plain view discovered during the course of a search reasonably directed at discovering a hiding suspect. Hence a warrantless home entry is likely to uncover far less evidence than a search conducted under authority of a search warrant. Furthermore, an arrest entry will inevitably tip off the suspects and likely result in destruction or removal of evidence not uncovered during the arrest. I therefore cannot believe that the police would take the risk of losing valuable evidence through a pretextual arrest entry rather than applying to a magistrate for a search warrant.

## B

While exaggerating the invasion of personal privacy involved in home arrests, the Court fails to account for the danger that its rule will "severely hamper effective law enforcement," *United States* v. *Watson,* 423 U. S., at 431 (POWELL, J., concurring); *Gerstein* v. *Pugh,* 420 U. S., at 113. The policeman

on his beat must now make subtle discriminations that perplex even judges in their chambers. As MR. JUSTICE POWELL noted, concurring in *United States* v. *Watson, supra,* police will sometimes delay making an arrest, even after probable cause is established, in order to be sure that they have enough evidence to convict. Then, if they suddenly have to arrest, they run the risk that the subsequent exigency will not excuse their prior failure to obtain a warrant. This problem cannot effectively be cured by obtaining a warrant as soon as probable cause is established because of the chance that the warrant will go stale before the arrest is made.

Further, police officers will often face the difficult task of deciding whether the circumstances are sufficiently exigent to justify their entry to arrest without a warrant. This is a decision that must be made quickly in the most trying of circumstances. If the officers mistakenly decide that the circumstances are exigent, the arrest will be invalid and any evidence seized incident to the arrest or in plain view will be excluded at trial. On the other hand, if the officers mistakenly determine that exigent circumstances are lacking, they may refrain from making the arrest, thus creating the possibility that a dangerous criminal will escape into the community. The police could reduce the likelihood of escape by staking out all possible exits until the circumstances become clearly exigent or a warrant is obtained. But the costs of such a stakeout seem excessive in an era of rising crime and scarce police resources.

The uncertainty inherent in the exigent-circumstances determination burdens the judicial system as well. In the case of searches, exigent circumstances are sufficiently unusual that this Court has determined that the benefits of a warrant outweigh the burdens imposed, including the burdens on the judicial system. In contrast, arrests recurringly involve exigent circumstances, and this Court has heretofore held that a warrant can be dispensed with without undue sacrifice in Fourth Amendment values. The situation should be no dif-

ferent with respect to arrests in the home. Under today's decision, whenever the police have made a warrantless home arrest there will be the possibility of "endless litigation with respect to the existence of exigent circumstances, whether it was practicable to get a warrant, whether the suspect was about to flee, and the like," *United States* v. *Watson, supra,* at 423–424.

Our cases establish that the ultimate test under the Fourth Amendment is one of "reasonableness." *Marshall* v. *Barlow's, Inc.,* 436 U. S. 307, 315–316 (1978); *Camara* v. *Municipal Court,* 387 U. S. 523, 539 (1967). I cannot join the Court in declaring unreasonable a practice which has been thought entirely reasonable by so many for so long. It would be far preferable to adopt a clear and simple rule: after knocking and announcing their presence, police may enter the home to make a daytime arrest without a warrant when there is probable cause to believe that the person to be arrested committed a felony and is present in the house. This rule would best comport with the common-law background, with the traditional practice in the States, and with the history and policies of the Fourth Amendment. Accordingly, I respectfully dissent.

MR. JUSTICE REHNQUIST, dissenting.

The Court today refers to both *Payton* and *Riddick* as involving "routine felony arrests." I have no reason to dispute the Court's characterization of these arrests, but cannot refrain from commenting on the social implications of the result reached by the Court. Payton was arrested for the murder of the manager of a gas station; Riddick was arrested for two armed robberies. If these are indeed "routine felony arrests," which culminated in convictions after trial upheld by the state courts on appeal, surely something is amiss in the process of the administration of criminal justice whereby these convictions are now set aside by this Court under the exclusionary rule which we have imposed upon the States under

the Fourth and Fourteenth Amendments to the United States Constitution.

I fully concur in and join the dissenting opinion of MR. JUSTICE WHITE. There is significant historical evidence that we have over the years misread the history of the Fourth Amendment in connection with searches, elevating the warrant requirement over the necessity for probable cause in a way which the Framers of that Amendment did not intend. See T. Taylor, Two Studies in Constitutional Interpretation 38–50 (1969). But one may accept all of that as *stare decisis,* and still feel deeply troubled by the transposition of these same errors into the area of actual arrests of felons within their houses with respect to whom there is probable cause to suspect guilt of the offense in question.