SHEPHERD, J.,
concurring.
I concur in the affirmance of the judgment of conviction and sentence in this case.
The dissenting opinion creates an image of a police car careening to a halt in the footpath of an unsuspecting citizen, urgency exuding, and an officer leaping forward to “ask” the person to “come to the station.” If these were the facts of the case, I would agree that Joshua Ladson’s confession should have been suppressed. The problem is this image does not square with the record.
The incident involved two unmarked police units under the command of lead officer, Detective Juan Segovia. One of the two vehicles, occupied by Detective Segovia and Detective Mike Dominguez, was stationed in front of the house where the defendant and his brother, Michael Lad-son, lived, awaiting Michael’s return from inside the house with identification. While waiting for Michael to emerge, the detectives observed a young black male exit from the side or back of the house and walk down the middle of the street to the east. Because Detective Segovia and his partner were occupied, Detective Segovia called the officers in the second unit, Sergeant Peter Andreu and Detective Larry Belyeu, who were parked about two blocks away, to see if they could approach and identify the individual who had just left the house. Sergeant Andreu and Detective Belyeu did so. Within minutes, Detectives Segovia and Dominguez, having given up on Michael coming out of the house again, drove to where the other officers found the defendant. The only testimony as to the location of the second unit, occupied by Sergeant Andreu and Detective Belyeu, who made the initial stop of Joshua, was that of Detective Segovia, the only witness at the suppression hearing. His testimony was as follows:
Q Okay. All right. So when you come up to Joshua Ladson, can you tell us where he is?
A He’s standing on the — on the roadway and my sergeant’s car was parked like on the, kind of like half in the grass half on the road, and they were just talking to him outside the car.
There is no testimony in the record about how Sergeant Andreu and Detective Be-lyeu approached Joshua in their vehicle, or the speed at which the vehicle travelled. *811 Any suggestion they took some action, either personally or with their vehicle, which constitutes evidence that Joshua was being taken into custody, is incorrect.
Nor does the answer to Joshua’s question about whether he would be back in time for football practice connote anything sinister. The testimony of Detective Segovia on this topic, which continues immediately following the testimony just quoted, is as follows:
Q Okay. He’s — Just so we’re a hundred percent clear, he’s inside or outside a police [car] at this time?
A Outside a police car.
Q And he’s standing on the street?
A Yes, sir.
Q Can you tell us if he’s in handcuffs?
A He’s not. No, he’s not cuffed.
Q So he’s standing on the street, not in handcuffs, not in the police car. Did you ask him his name?
A Yes, sir.
Q What does he say?
A He told me his name was Joshua Ladson.
Q Did you ask him any information regarding his age or date of birth?
A He provided his date of birth.
Q And what — When he told you his date of birth, how old did he turn out to be?
A I believe he was sixteen at the time, if I’m correct.
Q All right. At that time what did you ask him?
A At that time I asked him if he was willing to come and talk to me at the office reference an investigation.
Q And when you asked him if he’d mind going back to the office to talk about a — an investigation, what did he say?
A He said no problem. His only question was if I felt he would be back on time to go to football practice.
Q Okay. And what did you tell him when — when he asked if he — he would be back for football practice?
A I told him that all depended on how the interview-on how the interview went.
Q Was he under arrest?
A No, sir.
In fact, the answer provided by Detective Segovia is likely the only response that would not support the suppression of Joshua’s confession. Had Detective Segovia replied that Joshua would certainly not be able to attend football practice, such an answer would have indicated to a reasonable person that Joshua was not free to leave. On the other hand, had he replied that Joshua definitely would be able to attend football practice regardless of his statement to police, this answer would have suggested Joshua’s confession was obtained through a deceptive statement, as it could be understood as a promise not to prosecute. See Chambers v. State, 965 So.2d 376, 378 (Fla. 4th DCA 2007) (“For a confession to be admissible, it must be made voluntarily ... it must not be obtained by threats, promises, or the exertion of any improper influence ... promises not to prosecute may render a confession invalid.”) (internal citations omitted). Detective Segovia’s response to whether Joshua would be back in time for football practice does not indicate a custodial atmosphere to a reasonable person.
Defense counsel, borrowing from B.S. v. State, 548 So.2d 838 (Fla. 3d DCA 1989), in her brief, accurately poses the issue to be decided:
If [Ladson] went to the station because [he] had been the subject of the functional equivalent of an arrest — which was admittedly unjustified — the confes *812 sion must be suppressed.... On the other hand, if [he] went there on [his] own accord and without coercion, there was no illegality which would preclude the validity of the confession.
Id. at 839 (internal citations omitted). In determining which category the set of facts in our case falls, our precedent directs us to follow “a process ... based upon a consideration of the ‘totality of the circumstances,’ [the] ... relevant inquiry [being] how a reasonable man in the suspect’s position would have understood his situation.” Id. (internal citations omitted). Applying these rules, our case is both factually and legally distinguishable from B.S.
In B.S., the police approached B.S. at her home, “an area where a person enjoys the highest reasonable expectation of privacy under the Fourth Amendment,” see Payton v. New York, 445 U.S. 573, 589-90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), where she appeared in her pajamas, at an hour one might glean was either quite early or quite late in the day, babysitting her younger brother. B.S., 548 So.2d at 838. The police told B.S. they “wanted” her to come to the station for questioning. Id. When B.S. expressed concern she could not leave her brother alone, the officers told her they would take him to the station with her. Id. at 839. That is what occurred. Based on this showing, we reversed an order denying B.S.’s motion to suppress her confession, emphasizing that the police officers “phrased their wish for the appellant to come with them in terms of what they ‘wanted’ her to do.” We said that this term “while perhaps not so coercive as an order or demand, is much closer to that end of the continuum than a clearly non-mandatory ‘request’ or invitation.” Id. at 840 (quoting 2 W. LaFave, Search & Seizure § 5,1(a) at 391).
Our case is different. Here, Joshua was not approached at home. Rather, he was approached as he walked down the street on his way to school. There is no evidence of aggressive behavior by the officers who made initial contact with Joshua. Detective Segovia testified that he “asked [Joshua] if he was willing to come and talk to [him] at the office [in] reference [of] an investigation.” (Emphasis added). This testimony by Detective Segovia, which defense counsel was unable to shake on cross-examination, falls much closer to the non-mandatory end of Professor LaFave’s “coercion continuum.”
I am willing to accept the several considerations taken from B.S., see B.S., 548 So.2d at 839-41, advanced by both Joshua and the dissent as the “decisive” considerations in a case of this type. See Dissent Op. at pp. 17-20. However, unlike the defense and the dissent, I am of the view that only two of those four considerations exist in this case: (1) Ladson was sixteen on the morning of August 16, 2006, when he was approached by Detective Segovia, and (2) Ladson found himself in a “virtually coercive situation.” See id. at 839-40. Of course, all police encounters are coercive. Police encounters with persons who are uneducated, of diminished mental capacity, or a minor, are inherently likely to be even more coercive. However, our job remains to examine the totality of the circumstances, without giving undue weight to any particular factual circumstance, and determine whether the act in question is voluntary within the meaning of the Fourth Amendment. See Kaupp v. Texas, 538 U.S. 626, 629, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) (“A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty *813 to ignore the police presence and go about his business.”).
Our science is inexact, but in this case one thing is clear. Unlike B.S. — where the police accosted B.S. at her home, told her they “wanted” her to come to the station, and then countered her effort to demur by stating they would take her younger brother along — the encounter in our case happened in the middle of a residential street, at a reasonable hour, as Joshua was walking to school. There is no evidence of aggressive police tactics, and the cross-examined testimony of the lead detective was that he “asked” Joshua if he was willing to go to the police station. It is hard to divine what else the police could have done during this encounter that was not done short of expressly advising the youth the law did not require him to go to the station. However, I am unwilling to expand the exclusionary rule to impose such a requirement on officers dealing with the youth, the only deducible imperative I can draw from the frustration exhibited by the dissent in this case.
Viewing the record as a whole, I find no illegality in the police procedures employed in this case, and therefore no reason to have precluded the admission of the confession at the trial of the case.