[Cite as *State v. Feeney*, 2011-Ohio-5474.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| STATE OF OHIO | | C.A. No. 25727 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| ROBERT J. FEENEY | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR 10 01 0251 |

DECISION AND JOURNAL ENTRY

Dated: October 26, 2011

CARR, Judge.

{¶1}   Appellant, Robert Feeney, appeals the judgment of the Summit County Court of Common Pleas.  This Court affirms.

I.

{¶2}   On January 4, 2010, Feeney appeared in the Stow Municipal Court and entered a plea of guilty to charges of disorderly conduct and using weapons while intoxicated.  As part of the sentencing order, Feeney agreed to temporarily relinquish the firearms he had in his home.  This case arises out of law enforcement's subsequent trip to Feeney's home to recover the firearms.

{¶3}   On February 24, 2010, the Summit County Grand Jury indicted Feeney on one count of illegal manufacture of drugs in violation of R.C. 2925.04(A), a felony of the second degree; one count of illegally manufacturing or possessing explosives in violation of R.C. 2923.17(B), a felony of the second degree; one count of aggravated possession of drugs in

violation of R.C. 2925.11(A)(C)(1), a felony of the third degree; one count of illegal assembly or possession of chemicals or substances for the manufacture of prohibited weapons in violation of R.C. 2909.28(A), a felony of the fourth degree; one count of illegal cultivation of marijuana in violation of R.C. 2925.04(A), a felony of the fifth degree; one count of unlawful possession of a dangerous ordnance in violation of R.C. 2923.17(A), a felony of the fifth degree; one count of possession of marijuana in violation of R.C. 2925.11(A)(C)(3), a felony of the fifth degree; two counts of possessing criminal tools in violation of R.C. 2923.24, felonies of the fifth degree; and one count of illegal use or possession of drug paraphernalia in violation of R.C. 2925.14(C)(1), a misdemeanor of the fourth degree. There was also a criminal forfeiture specification which pertained to the first eight counts of the indictment.

{¶4} On March 12, 2010, Feeney filed a motion to suppress. The trial court held a two-day hearing on the motion to suppress beginning on May 20, 2010. At the conclusion of the hearing, the trial court judge made several statements on the record prior to denying the motion. The trial court determined that the municipal court judge wanted "the police to check to make sure that there are no guns in [the home] where the parents can be in any kind of harm." The trial court stated the police were in compliance with the court order when they checked for guns in the bedroom and that the municipal court judge did not indicate that the order was limited to "the six guns that [were] in the locked box." The trial court subsequently stated, "It's hard for me to believe that the parents went up, whichever one, and retrieved this lockbox and didn't see other guns themselves in the house or didn't know that they were *** in his room[.]" The trial court subsequently issued a one-sentence journal entry denying the motion to suppress on June 2, 2010.

**{¶5}** On August 26, 2010, a supplemental indictment was filed which charged Feeney with five counts of pandering sexually oriented matter involving a minor in violation of R.C. 2907.322(A)(5), felonies of the fourth degree; four counts of pandering obscenity involving a minor in violation of R.C. 2907.321(A)(5), felonies of the fourth degree; and six counts of illegal use of a minor in nudity oriented material or performance in violation of R.C. 2907.323(A)(3), felonies of the fifth degree.

**{¶6}** On October 14, 2010, Feeney appeared in the trial court and entered a plea of no contest to fourteen counts in the indictment. He was sentenced to an aggregate term of five years imprisonment. Feeney was also found to be a Tier II sexually-oriented offender. The trial court's sentencing entry was journalized on November 30, 2010.

**{¶7}** Feeney filed a notice of appeal on December 14, 2010. On appeal, Feeney raises one assignment of error.

II.

**ASSIGNMENT OF ERROR**

"THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION
TO SUPPRESS EVIDENCE."

**{¶8}** In his sole assignment of error, Feeney argues that the trial court erred in denying his motion to suppress. This Court disagrees.

**{¶9}** In support of his assignment of error, Feeney argues that the trial court erred in denying his motion to suppress because the police did not obtain lawful consent to search his bedroom. Feeney asserts that his parents did not give the officers consent to search the home, but simply acquiesced to the officers' desire to do so because they thought they had no other choice. Feeney further argues that the search for firearms was a ruse which allowed the police to conduct a search for narcotics. The State argues that the record indicates that the police properly

obtained consent from the Feeneys prior to searching the bedroom. The State further notes that while there was contrasting testimony at the hearing, it was within the purview of the trial court to resolve issues of credibility.

{¶10} The Supreme Court of Ohio has held:

"Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Internal citations omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶8.

{¶11} The Fourth Amendment of the United States Constitution and Section 14, Article I of the Ohio Constitution secure an individual's right to be free from unreasonable searches and seizures. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York* (1980), 445 U.S. 573, 586. When the State conducts a warrantless search, it bears the burden of demonstrating that the search was valid. *Xenia v. Wallace* (1988), 37 Ohio St.3d 216, 218, citing *State v. Kessler* (1978), 53 Ohio St.2d 204, 207. This Court has recognized the seven exceptions to the general warrant requirement that have been explicitly identified by Supreme Court of Ohio. Those exceptions are:

"(a) [a] search incident to a lawful arrest; (b) consent signifying waiver of constitutional rights; (c) the stop-and-frisk doctrine; (d) hot pursuit; (e) probable cause to search, and the presence of exigent circumstances; [] (f) the plain view doctrine[;] or (g) an administrative search[.]" (Quotations and citations omitted.). *State v. Price* (1999), 134 Ohio App.3d 464, 467, citing *State v. Akron Airport Post No. 8975* (1985), 19 Ohio St.3d 49, 51, and *Stone v. Stow* (1992), 64 Ohio St.3d 156, 164.

{¶12} "Whether consent was voluntarily given is a question of fact to be determined from the totality of the circumstances, and the government bears the burden of showing that consent was 'freely and voluntarily' given by 'clear and positive' evidence." *State v. Cummings* (Jan. 16, 2002), 9th Dist. No. 20609, citing *State v. Robinette* (1997), 80 Ohio St.3d 234, 243.

{¶13} The sequence of events which led to Feeney's filing a motion to suppress began on January 4, 2010, when Feeney appeared in the Stow Municipal Court and entered a plea of guilty to charges of disorderly conduct and using weapons while intoxicated. As part of his sentence, Feeney agreed to temporarily turn over the firearms in his home. At the time of the incident, Feeney lived with his parents in Cuyahoga Falls. Feeney had been arrested after a heated argument with his father. The municipal court judge expressed concern that there had been a gun involved in the argument. The municipal court judge stated that she did not want Feeney to harm himself, his father, or his mother. The municipal court judge further stated, "before I permit you to go back home, I want to know that *** the guns *** [have] been turned over to the [Cuyahoga] Falls [police] for safekeeping[.]" Both a recording of the entire municipal court hearing and transcript of the sentencing portion of the hearing were introduced as exhibits at the suppression hearing.

{¶14} Four witnesses testified on behalf of the State at the suppression hearing. Officer John Sim, who is an officer assigned to the Stow Municipal Court, testified as follows. Officer Sim was in the courtroom on the day that Feeney entered his guilty pleas. When asked about the nature of the judge's sentencing order, Officer Sim testified as follows:

> "As I recall it, the Judge had told Mr. Feeney that due to the fact that he had been arrested for weapons while -- I believe he was intoxicated at the time, she was concerned about the safety of the family members in the home and she had asked him if there were any other guns in the house, he said there were.

"And she would like – she wanted the guns removed from the house for safekeeping with his agreement and he agreed to that.

"I believe she wanted either the father to lock them up or the police to get them, whichever one he chose."

Officer Sim then testified that Feeney agreed to have the police go to his parents' house to retrieve the firearms. Officer Sim then exited the courtroom and called for a cruiser to go over to the house. Shortly thereafter, Officer Sim was advised from the cruiser that they could not get into Feeney's room because it was locked. At that time, Feeney was still at the courthouse meeting with a C.S.S. representative. Officer Sim then had Feeney speak with his mother on the phone. While Officer Sim could only hear Feeney's side of the conversation, Officer Sim testified that he heard Feeney say, "Go ahead and let them in." Officer Sim indicated that it was specifically communicated to Feeney that the police could not get into his bedroom.

{¶15} On cross-examination, Officer Sim testified that he never heard the municipal court judge say anything about searching the house. Officer Sim also clarified that he informed dispatch that the judge wanted the additional guns removed from the home but he did not speak with any specific officer. Officer Thomas called later to inform him that they were not able to get into Feeney's room. When asked if Feeney's statement, "Let them in," could have been in reference to the house and not his bedroom, Officer Sim testified, "Well, the specific conversation was about getting into his room, that's the door that was locked."

{¶16} Officer Scott Thomas also testified on behalf of the State at the suppression hearing. On January 4, 2010, Officer Thomas was dispatched to Robert Feeney's home to retrieve the firearms. Officer Thomas approached the residence located at 1613 Short Ave., in Cuyahoga Falls, Ohio, and he was met at the door by Feeney's mother, Mary Feeney. Officer Thomas testified that it appeared Feeney's parents were expecting him because Mary invited him

into the house and the guns were already laid out. Feeney's father, John Feeney, was seated on the couch and did not move during the course of Officer Thomas's visit. Officer Thomas found "six or seven" handguns on the couch in the living room. Officer Thomas then asked Mary if she knew if her son had any other guns in the house or in the bedroom. Mary replied, "I don't go in the bedroom." Officer Thomas asked if she would mind if he went into the bedroom to look around for guns. Mary answered, "Okay. Give me a few minutes. Stay downstairs." Officer Thomas testified that she was gone for five to ten minutes and, during that time, Officer Stanley arrived on the scene. Mary then informed the officers that they could come up and she showed them to Robert Feeney's room.

{¶17} Officer Thomas testified that the door to the bedroom was "wide open" when he went upstairs. Officer Thomas testified that Mary indicated that they could "go in and have a look inside the room." Officer Thomas testified he was not present when Mary communicated with her son on the telephone and he did not speak with anyone from the court. The first thing Officer Thomas noticed when he walked into the room was the smell of marijuana. He then observed a vent and ductwork in the ceiling. Officer Thomas testified that Officer Stanley noticed a loaded handgun sitting on a nightstand beside the bed. Officer Thomas also saw bags of potting soil and he could tell that there was a bright light and a fan behind the closet doors. When Officer Stanley opened the closet, Officer Thomas observed marijuana plants inside. Officer Thomas testified that Officer Stanley also found a rifle in the closet where the marijuana was being grown. Officer Thomas further testified, "We found altogether probably 10, 12 more firearms inside the room." Officer Thomas indicated that he ended up calling his supervisor, Sergeant Jones, to come out to the scene. The officers then removed the guns from the house. Two narcotics officers responded to the scene. Officer Thomas testified that when the narcotics

officers came to the scene, they searched the room again "looking for some more weapons." Officer Thomas testified that the officers soon stopped searching and went to get a search warrant for drugs based on the marijuana they had observed.

{¶18} On cross-examination, Officer Thomas clarified that he did not know which guns belonged to Robert Feeney. Officer Thomas testified that he did not call the household before he arrived and he did not speak with Robert Feeney. When asked by defense counsel if he expected to conduct a search when he arrived, Officer Thomas testified, "If I had to look for his guns I was going to look for the guns; yes." Officer Thomas further testified that he was instructed to retrieve the guns but he was not instructed to search any specific areas in the house. When asked why he continued to search for guns after he observed the weapons on the couch, Officer Thomas testified, "I'm trained to do a thorough job. If I left that house with guns in his room and something happened, it would be my responsibility[.]" Officer Thomas indicated he did not get permission directly from Robert Feeney because he never spoke with him.

{¶19} On redirect examination, Officer Thomas testified that after initially finding guns in the room and then opening the closet and finding marijuana grow, the officers waited for the warrant to arrive prior to conducting an additional search. Officer Thomas testified that no additional evidence was discovered after the time when the narcotics officers arrived but prior to when they secured a search warrant. Officer Thomas also clarified that while he did not have any direct communication with the municipal court judge, it was his understanding that dispatch had been in contact with Officer Sim. On re-cross examination, Officer Thomas testified that he was not aware of any communications between the officers and Mary Feeney while they were waiting for the search warrant. The trial judge permitted the State to conduct further redirect examination. At that time, Officer Thomas testified that during the search which was carried out

pursuant to the warrant, the officers found some explosives, silencers, and some computer hard drives.

{¶20} Officer James Stanley gave the following testimony regarding his perception of the events that transpired on January 4, 2010. Officer Stanley and Officer Thomas were dispatched to the Feeneys' home because "there were guns in the home that the Court wanted us to remove from the home for safekeeping." The officers were not told where the guns would be in the home. Officer Stanley was working in a separate district so he was "five or six minutes" behind Officer Thomas in arriving at the Feeneys' house. Officer Stanley testified that when he entered the house, a man he believed to be the homeowner directed him to an upstairs bedroom where Officer Thomas was with an older woman. When Officer Stanley entered the room, he noticed a commercial floor fan that was mounted on a cabinet with a box. Flexible HVAC tubing was coming out of the box and was suspended across the ceiling and went into a closet. The closet doors were closed but Officer Stanley noticed a light that was emitting through the cracks. Officer Thomas informed Officer Stanley that he had already located a couple of weapons in the room. Officer Stanley was in the room for less than ten minutes before he called a lieutenant and indicated he needed a supervisor as well as narcotics officers to come out to the house. While he was waiting for a supervisor to arrive, Officer Stanley scanned the room for weapons and observed a loaded nine millimeter handgun that was on the desk next to the computer. Officer Stanley found another gun in a dresser drawer, as well as miscellaneous cartridges and different rounds of ammunition. Officer Thomas located an ammunition box containing rounds of ammunition for a rifle. As the officers had only located handguns, they began looking for a rifle. Officer Stanley opened the closet and saw a rifle which had been placed in a weapon sleeve. At that time, Officer Stanley also observed cabinets in the closet that

had marijuana plants on them. After the sergeant and the narcotics officers arrived on the scene, Officer Stanley transported the weapons that had been discovered back to the station where they were turned over to another officer who tagged them into property. Officer Stanley testified that he did not remove anything from the house other than weapons. Officer Stanley further testified that he did not search any rooms in the home other than the bedroom.

{¶21} On cross-examination, Officer Stanley testified that dispatch did not indicate how many guns he was supposed to retrieve pursuant to the court order. Officer Stanley clarified that when he arrived, he did not know how Officer Thomas got into the bedroom. Officer Stanley did notice the guns on the couch in the living room and he perceived those to be some of the guns that they were to take. Officer Stanley testified his thought process was to search the house to get every gun out of the house. Officer Stanley did not return to the house after transporting the weapons to the police station. Officer Stanley did not hear any conversations that occurred between Mary Feeney and the other officers. When asked if he heard Mary consent to the search of the bedroom, Officer Stanley testified, "No. At that point I believe it had already been established; Officer Thomas got there before I was there." Officer Stanley testified on redirect examination that when he arrived at the residence, Officer Thomas explained to him that there were guns on the couch in the living room but they were looking for others in the bedroom. Officer Stanley understood the search to be ongoing when he arrived. On re-cross examination, Officer Stanley testified that he assumed consent had been given when he observed the homeowner in the bedroom with Officer Thomas.

{¶22} Detective Mike Anderson, who serves on the narcotics unit of the Cuyahoga Falls Police Department, was the final witness to testify on behalf of the State. On January 4, 2010, Detective Anderson received a call from Sergeant Perry Tabak directing him to go to the

Feeneys' home. When Detective Anderson and his partner, Detective Roach, arrived at the house, Officer Thomas and Officer Stanley briefed them on the situation. Detective Anderson testified that Officer Thomas told him that Mary Feeney had given consent to go into the room to look for more guns. Detective Anderson was further notified that when the officers had entered the room, they located additional firearms as well as an "elaborate marijuana grow setup." Detective Anderson spoke with John and Mary Feeney about the New Year's Eve incident that had led to Robert Feeney's arrest. Detective Anderson testified that Robert Feeney had been arrested on a gun charge as well as disorderly conduct and that John and Mary Feeney knew the police had come to remove the firearms from the house. Detective Anderson testified that he asked John and Mary Feeney if it was okay to search the room and they "both said look anywhere you want in the house." When Detective Anderson entered the room, he could observe marijuana plants, growing equipment, potting soil, as well as firearms on the desk. Detective Anderson then contacted Sergeant Tabak and informed him that he wanted to get a search warrant. Sergeant Tabak came to the scene and, after a brief discussion, Detective Roach went to type up the search warrant and have it signed by a judge. Detective Roach called Detective Anderson a short time later and indicated that the warrant had been signed. The inventory sheet for the warrant was introduced as an exhibit at the hearing. Detective Anderson testified that 128 items were listed on the inventory sheet, including incubators for starting marijuana, marijuana plants, psilocybin mushrooms, explosives, hand grenades, fuses for hand grenades, cases of ammunition, an elaborate computer system with 13 external hard drives, as well as many other items. Detective Anderson further testified that John and Mary Feeney owned the home and they consented to the police being in the home.

{¶23} On cross-examination, Detective Anderson stated that he removed the marijuana plants from Robert Feeney's room while the officers were waiting for Detective Roach to obtain a search warrant. Officer Stanley also removed the weapons from the room at that time.

{¶24} John Feeney was the only witness to testify on behalf of his son at the hearing and gave the following testimony regarding the January 4, 2010 incident. John testified that his wife, Mary, had passed away since the date of the incident. At the time of the incident, Mary was suffering with esophageal cancer and she had been undergoing chemotherapy. John testified that Robert called home at approximately 10:00 a.m. on January 4, 2010, and informed Mary that the police were coming to pick up some firearms. John testified that his wife informed him that the "police were coming, there were six guns that were in a red locked box up in the bedroom, they wanted the six guns and I should bring them down so that they were ready when they came." John retrieved the guns from a locked box in Robert's bedroom and placed them on the couch in the living room. John testified that, while he did not have a conversation with Robert, it was his understanding that the police were coming to take the guns on the couch. Two police officers came to the residence. John testified that the officers looked at the guns on the couch and said, "These aren't the right guns." John attempted to explain that he had retrieved all of the guns in the locked box but the officers insisted they were not the right guns. The police officers then placed the guns in a brown paper bag and said, "We're going to have to look upstairs." Mary then asked why the officers needed to look upstairs. The officers responded, "We just do. *** Why not? Do you have anything to hide?" John testified that the officers did not have a court document or warrant upon their initial arrival.

{¶25} John testified that the officers proceeded to walk up the stairway with Mary following behind them. John heard Mary speaking with the officers but he could not make out

what was said. From his position in the living room, John could see Mary but he could not see the officers. The guns which had been placed in a paper bag remained on the couch while the officers proceeded upstairs. After a few minutes, the officers came back downstairs and said, "We're going to have to come back." When asked if he felt he had any say in what happened, John testified, "My wife did say they kind of bullied her when they took -- when they went upstairs. They kind of, like, intimidated her." John indicated that the officers were "coming and going all day[]" and they remained in the home until 7:00 or 8:00 p.m. The officers did not have any problem getting into Robert's room because, on this particular day, it was not locked. John testified that after the officers obtained a warrant, they started searching in other areas of the house. John clarified that he never gave the officers consent to search the house. John further testified that he did not realize that he could ask the officers to leave the house.

{¶26} John further identified a note that Mary had drafted after she lost her voice and could not speak. John stated that he was with Mary in the living room of their house when she wrote the note on March 29, 2010. When asked to paraphrase the note, John testified that Mary indicated she "[d]id not tell them they could go into Bob's room. He had six guns in the locked box; we never go into his room; he always keeps it locked." John testified that Mary wrote the note because she felt she had to say something and she was having trouble communicating due to her condition. John testified that his wife passed away on April 17, 2010.

{¶27} John further testified that at approximately 6:00 p.m. on January 4, 2010, the police officers asked John and Mary to leave their house. John and Mary then went to the home of John's sister to get something to eat. John and Mary left the officers in the home until approximately 7:30 p.m. when they returned. John concluded that at no point did he or his wife give the officers consent to search the home for weapons.

{¶28} On cross-examination, John testified that he did not know how many guns the police were to remove from the home pursuant to the court order. John admitted that he knew Robert had more guns than what had been placed on the couch but he did not know the location of those guns. John testified that he did not know if the municipal court order went beyond the scope of removing the guns from the locked box. John did not observe any firearms in Robert's room other than those guns in the locked box. When asked if the police officers who testified that they received consent to search Robert's room were lying, John testified that they were, in fact, lying. John further testified that the police officers never inquired as to whether Robert had additional guns other than those contained in the locked box.

{¶29} On redirect examination, John testified that Robert did not have an attorney when he appeared in municipal court on January 4, 2010. John testified that when the police came to the house, they told him and his wife that Robert did have an attorney in court. John stated the police told both him and Mary that Robert "had a lawyer and everything would be taken care of."

{¶30} A review of the record reveals that the trial court did not err in denying Robert Feeney's motion to suppress. The police were dispatched to the Feeney residence in order to retrieve the guns pursuant to the municipal court order. Officer Thomas and Officer Stanley indicated they were under the impression that they were to retrieve all of the guns in the home. There was sharply contrasting testimony on the issue of whether the police were given permission to look for guns in Robert Feeney's bedroom. Officer Thomas testified that Mary Feeney consented to a search of the bedroom for additional firearms. Detective Anderson testified that both John and Mary Feeney consented to a search for weapons. John Feeney testified that neither he, nor his wife, consented to a search of Robert's bedroom. At the suppression hearing, the trial judge expressed doubt in regard to the credibility John Feeney's

testimony by noting that it was "hard to believe" that he did not notice the other guns when he initially retrieved the guns from the locked box. The trial court is in the best position to resolve factual questions and evaluate the credibility of witnesses at a suppression hearing. *Akron v. Holmes*, 9th Dist. No. 21590, 2004-Ohio-832, at ¶10. As it is within the purview of the trial court to resolve issues of credibility in favor of the State, the trial court did not err in denying Robert Feeney's motion to suppress.

**{¶31}** Robert Feeney's assignment of error is overruled.

### III.

**{¶32}** Robert Feeney's sole assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

BELFANCE, P. J.,
DICKINSON, J.
CONCUR

APPEARANCES:

GEORGE C. PAPPAS, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.