OPINION OF THE COURT
Mark Dwyer, J.
Defendant Mendoza moves to suppress property seized at or near the time of his arrest. He moves as well to suppress a statement he made at a precinct after the arrest, and a lineup identification also obtained at the precinct. For the reasons that follow, the motion is granted in part and denied in part.
A
At a suppression hearing the People presented the testimony of three witnesses. Detective Richard Pengel was assigned to the investigation of a robbery committed by two men who pretended that they were selling a BMW to a third. After that man turned over $9,000, one of the two “sellers” displayed a handgun. The men then drove off with the car, its title, and the money. The investigation led to defendant, whom the victim picked out from a photo array. Detective Pengel next issued a “probable cause” investigation card to notify other members of the police force that defendant should be arrested. No arrest warrant was sought.
Detective Corey Gresko and his supervisor, Sergeant Christopher Daly, were on the Warrant Squad team assigned to locate defendant. The officers traced the license plate number of the BMW to Micheli Perez, a woman who lived in a fourth floor apartment at 206 West 148th Street; that was also the address where the victim first met with the two men who offered to sell him the car. Police records showed that the *1009 woman’s phone number was one that defendant had supplied after an earlier arrest. In the early morning hours on October 16, 2014, the officers drove to Ms. Perez’s building to look for defendant in her apartment.
After Sergeant Daly took a position outside the building, behind Ms. Perez’s apartment line, Detective Gresko and his partner rang the doorbell. A man came to the door and asked through the door who was there. When the Detectives identified themselves, the man walked away. The Detectives responded by knocking in a “regular, like, light” way. Soon Sergeant Daly saw an arm extend from a window in Ms. Perez’s apartment and throw a bag out with an underhand “softball-like” motion. The bag proved to contain over a pound of heroin. A scale was thrown out after the bag.
In the meantime, the Detectives at the apartment door knocked more loudly and told the occupants to open up. After about 10 minutes defendant finally did. Detective Gresko reached out and “pulled” defendant “through the threshold” into the exterior hallway. There defendant was placed in handcuffs.
Once defendant was secured, the Detectives entered the apartment and conducted a security sweep “for safety reasons.” They next allowed defendant inside to dress. Defendant chose to put on jeans. Inside the pocket was jammed a large wad of cash amounting to $9,155. Defendant was taken to the 32nd Precinct, where the bills were vouchered. The Warrant Squad Detectives then turned defendant over to Detective Pengel.
Detective Pengel gave defendant his Miranda warnings, which defendant individually acknowledged. The Detective then wrote out a statement that defendant dictated to him. Defendant reviewed the written statement and signed it. Throughout the process defendant appeared alert, sober, and articulate. No promises or threats were made to him, and he never asked for an attorney. In the statement defendant admitted to being with the victim in the car, but said that negotiations had broken down and that he did not sell the car.
At 4:55 p.m. Detective Pengel conducted a lineup for the victim. The victim, who had reached the Precinct an hour before, had been isolated so that he could not see the four fillers arrive. Defendant and the fillers were all dressed in white T-shirts, and sheets were placed across their legs to hide differences in the pants they wore. Defendant chose the middle position, number three. The victim was read the lineup instruc *1010 tions and was escorted to the viewing room, where he looked at the lineup and identified defendant.
Defendant was later taken to ECAB, the District Attorney’s Early Case Assessment Bureau. There he was again given his Miranda warnings and made a statement recorded on a computer disk.
Defendant presented one witness at the hearing, Micheli Perez. Ms. Perez was a real estate and landlord-tenant attorney who practiced in the Bronx. Defendant was the father of her child.
Ms. Perez told the court that she and defendant were present with their child in her apartment overnight on October 15-16, 2014. At about 7:00 a.m. on the 16th she and defendant were awakened by loud insistent knocking on the front door. Not knowing who would be outside, she called 911 to summon assistance. Ultimately, the 911 operator told her that the police were there. Defendant, wearing pajama bottoms, went to open the front door. He was out of Ms. Perez’s sight when he did that but Ms. Perez heard “a lot of scuffling” after the door was opened.
The police later brought defendant into the living room, where he and Ms. Perez sat together on the couch. While they were there the police searched the bedroom and recovered defendant’s money. After a time they took defendant and Ms. Perez to the Precinct. Notably, the prosecutor’s exhibit shows that, during the lineup, defendant was not wearing jeans. He appears to be wearing pajama bottoms.
B
The parties’ burdens of proof on Mapp I Payton issues are well established. The People’s initial obligation is to set forth facts which, if believed, would justify a ruling that the challenged police conduct was consistent with Fourth Amendment dictates.
If the People do that, the defendant is required to show, by a preponderance of the believable evidence, that the police conduct instead violated the Constitution. (People v Whitehurst, 25 NY2d 389, 391 [1969].)
The court finds the facts to be consistent with the testimony of the witnesses as recited above. There is in fact little difference between the prosecutor’s version, and that of Ms. Perez. There plainly was probable cause to arrest defendant and to *1011 think that he could be found in Ms. Perez’s apartment. There was no reason provided by the evidence to doubt the material testimony about what happened in Ms. Perez’s apartment at the time of the arrest. There are two exceptions: the court believes that Ms. Perez is wrong as to whether she and defendant had reason to know the police were at their door, and that Detective Gresko is wrong as to his testimony that defendant’s cash was recovered while defendant, after the arrest, changed from pajama bottoms into jeans that happened to contain the cash. But, as will be made clear, that testimony will not much matter.
On Wade identification issues, the burdens on the parties are the same as they are on Mapp /Payton issues. (People v Delamota, 18 NY3d 107, 118 [2011].) In this case, the People’s exhibits convince the court that there was no Wade error. Defendant has not shown any reason to believe that defendant was picked out from the photo array or the lineup because of police suggestiveness.
On Huntley issues, the burdens are different. The People must show beyond a reasonable doubt that a defendant’s statements were made voluntarily, and if they were custodial statements (as defendant’s plainly were) that they were made after properly administered Miranda warnings. (See People v Huntley, 15 NY2d 72, 78 [1965].) This court finds that the People’s uncontested proof amply satisfied their burden on the Huntley issues.
Based on those findings, the court denies defendant’s Wade and Huntley motions to suppress identification evidence and the evidence of his statements. The Fourth Amendment issues include challenges on Fourth Amendment grounds to that same evidence as well as the physical evidence recovered, and they are not so readily resolved.
C
Payton v New York (445 US 573 [1980]) is our starting point. Relying on principles well established in the Anglo-American legal tradition, the Court concluded that a man’s home is his castle — in the absence of a warrant permitting police entry. Even officers armed with probable cause to believe that the defendant has committed a crime may not cross his threshold to take him into custody in the absence of judicial authorization.
In this case, an understanding of what it is to “cross the threshold” will be most significant. Here, Detective Gresko *1012 reached into defendant’s apartment, pulled him out, and arrested him. The court finds that, albeit as a matter of inches, the Detective crossed the threshold of defendant’s apartment in making the arrest.
And in fact, for better or worse, the law deals with the issue as one of inches. An arrest of a defendant who exits a home, even barely, does not implicate Payton. (See e.g. People v Garvin, 130 AD3d 644, 645 [2d Dept 2015].) By the same token, an arrest just across the threshold does violate Payton. (See e.g. People v Riffas, 120 AD3d 1438 [2d Dept 2014].) And an arrest on the threshold is proper. (See e.g. People v Garvin, 130 AD3d 644, 645 [2d Dept 2015].)
The question thus becomes, where is the “threshold”? No New York case since Payton appears to have addressed the issue. But, based on Riffas and the remaining cases just cited, this court concludes that, for Payton purposes at least, the threshold is the area directly between doorjambs — no more and no less.
It follows that here, as in Riffas, for Detective Gresko to reach across the threshold and pull defendant through it violated Payton. It remains only to decide what evidence, if any, must be suppressed as a result. At stake are the $9,155 recovered in the apartment, the statements to Detective Pen-gel and at ECAB after the arrest, and the post-arrest identifications.
D
As to all those items of evidence, the People assert that the Payton intrusion was justified by exigent circumstances. If it was, all of the evidence would have been legally obtained. (See People v Saunders, 290 AD2d 461 [2d Dept 2002]; People v Murray, 277 AD2d 96 [1st Dept 2000].)
The People’s argument is based in large part on the nature of defendant’s alleged armed robbery. The People correctly note that the robbery was achieved with a gun. Moreover, the second perpetrator, who had displayed the weapon, was at large, and could conceivably have been present in Ms. Perez’s apartment.
The answer to the People must be, simply enough, that the police saw no exigency as they planned their approach to Ms. Perez’s apartment. It was obvious that defendant might not freely admit the police into his apartment. Yet six days passed between the issuance of the investigation card calling for defendant’s arrest, and the arrest itself. The police could *1013 easily have obtained an arrest warrant during that period. They chose not to do so. If an exigency was foreseen, a no-knock order for entry could also have been obtained. But the police chose to approach the apartment with neither — strongly suggesting that the Warrant Squad itself saw no special danger. This court will not permit the police to create their own “exigency” by avoiding the obvious legal forms for almost a week, and then assert that their arrival created a “sudden” need to ignore long-available legal procedures.
This court is well aware of the fact that an arrest warrant, with or without a no-knock provision, entitles the defendant to an attorney, before he makes a post-arrest statement. (See People v Samuels, 49 NY2d 218 [1980].) That does not matter. The court is not about to recognize, as a “good” reason for the police not to obtain an arrest warrant, the desire to avoid the right to counsel.
But this answer to the People’s exigency arguments addresses only what the police knew as they approached the apartment door. The People also argue that what happened during their efforts to enter created exigent circumstances, justifying a warrantless entry, and the court now turns to those arguments.
The People note that defendant tried to dispose of or destroy evidence after the police announced their presence. That is true. Defendant’s reaction to having police at his door was to throw a very large amount of heroin out the window, and a scale just after.
Sergeant Daly saw those actions, and easily recovered the evidence. It should be noted that the police had no notice of defendant’s involvement with narcotics dealing, and thus no reason to think that defendant might destroy evidence of narcotics dealing. In any event, defendant’s efforts were— doubtless to his surprise — completely ineffectual. There was no reason to think he would change tactics, and dispose of evidence except by tossing it to the waiting Sergeant Daly. And of course, defendant was in custody once the Payton violation occurred. The police (according to Detective Gresko) recovered the cash while allowing defendant to dress after his illegal arrest, and not in a search justified by any other exigency. And Ms. Perez testified that the money was obtained in a general search. But the People’s lineup photo shows defendant was wearing what appear to be pajama bottoms, not blue jeans. I credit Ms. Perez on this point.
*1014 E
As to the identification and statement evidence, the People argue that the lineup and the statements were “attenuated” or otherwise immunized from the Payton violation. The lineup question is easily answered. The Court of Appeals has ruled that lineup identifications obtained at locations other than the arrest location are by their nature not subject to suppression. (People v Jones, 2 NY3d 235, 243-245 [2004].)
A different result follows as to the first statement.
After defendant’s arrest he was transported to the 32nd Precinct and turned over to Detective Pengel. Defendant agreed to speak with the Detective. He waived his Miranda rights about 12:45 p.m. and dictated a statement to Detective Pengel. The Detective recorded it, and defendant signed the statement. In it he acknowledged that he tried to negotiate a sale with the victim. But, he claimed, no deal could be reached, and he and his partner left. It was perhaps four hours after defendant’s arrest.
Defendant next was transported to 100 Centre Street, where the District Attorney’s Office maintains an “ECAB office” for early case assessment. An assistant district attorney met defendant there at about 9:00 p.m. Defendant again waived his Miranda rights and made a statement, this one recorded on video. Detective Pengel was also present. The statement was apparently made over five hours after the precinct statement.
Based on those facts, the court finds that the making of the first statement was not attenuated from the illegal arrest. The Detectives who arrested defendant took him through the initial post-arrest processing and then quickly handed him off to Detective Pengel. The time interval was not long — perhaps four hours. The Precinct remained the same. The arrest must have been quite fresh in defendant’s mind, with no non-routine events occurring in the interim. While defendant retained the presence of mind to deny the robbery, honestly or otherwise, he placed himself with the victim at the time of the alleged crime. The court can find nothing on these facts that “attenuates” the illegal arrest. (See e.g. People v Harris, 77 NY2d 434, 440-441 [1991].)
The court’s conclusions are different with respect to defendant’s second statement, with one proviso to be noted later. By 9:00 p.m. at least five hours had passed since defendant’s precinct statement. That was in addition to the time between the arrest and the first statement; the total time seems to have *1015 been 10 to 12 hours. The circumstances were now different. True, Detective Pengel was present for the ECAB statement, as he had been for the precinct statement. But the second statement was taken “downtown” by the courts. It was delivered to an assistant district attorney, not a precinct detective. And there is no suggestion that it was involuntary. (See People v Santos, 3 AD3d 317 [1st Dept 2004]; People v Chen Ren Jie, 280 AD2d 301 [1st Dept 2001].)
The proviso: neither side has advised me of how the “cat out of the bag” theory might or might not apply. I will give them a brief opportunity to do so.
For the reasons noted above, the court orders that the cash recovered in the apartment, and defendant’s station statement, be suppressed. Otherwise, defendant’s motion to suppress is denied.